# TISON *v.* ARIZONA

No. 84–6075.   Argued November 3, 1986—Decided April 21, 1987*

*Together with *Tison* v. *Arizona,* also on certiorari to the same court (see this Court's Rule 19.4).

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, POWELL, and SCALIA, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, and in Parts I, II, III, and IV–A of which BLACKMUN and STEVENS, JJ., joined, *post*, p. 159.

*Alan M. Dershowitz*, by appointment of the Court, 475 U. S. 1079, argued the cause for petitioners. With him on the briefs were *Stephen H. Oleskey, Cynthia O. Hamilton, Susan Estrich*, and *Nathan Dershowitz*.

*William J. Schafer III* argued the cause for respondent. With him on the brief was *Robert K. Corbin*, Attorney General of Arizona.

JUSTICE O'CONNOR delivered the opinion of the Court.

The question presented is whether the petitioners' participation in the events leading up to and following the murder of four members of a family makes the sentences of death imposed by the Arizona courts constitutionally permissible although neither petitioner specifically intended to kill the victims and neither inflicted the fatal gunshot wounds. We hold that the Arizona Supreme Court applied an erroneous standard in making the findings required by *Enmund* v. *Florida*, 458 U. S. 782 (1982), and, therefore, vacate the judgments below and remand the case for further proceedings not inconsistent with this opinion.

I

Gary Tison was sentenced to life imprisonment as the result of a prison escape during the course of which he had killed a guard. After he had been in prison a number of years, Gary Tison's wife, their three sons Donald, Ricky, and Raymond, Gary's brother Joseph, and other relatives made plans to help Gary Tison escape again. See State v. Dorothy Tison, Cr. No. 108352 (Super. Ct. Maricopa County 1981). The Tison family assembled a large arsenal of weapons for this purpose. Plans for escape were discussed with Gary Tison, who insisted that his cellmate, Randy Greenawalt, also a convicted murderer, be included in the prison break. The following facts are largely evidenced by petitioners' detailed confessions given as part of a plea bargain according to the terms of which the State agreed not to seek the death sentence. The Arizona courts interpreted the plea agreement to require that petitioners testify to the planning stages of the breakout. When they refused to do so, the bargain was rescinded and they were tried, convicted, and sentenced to death.

On July 30, 1978, the three Tison brothers entered the Arizona State Prison at Florence carrying a large ice chest filled with guns. The Tisons armed Greenawalt and their father, and the group, brandishing their weapons, locked the prison guards and visitors present in a storage closet. The five men fled the prison grounds in the Tisons' Ford Galaxy automobile. No shots were fired at the prison.

After leaving the prison, the men abandoned the Ford automobile and proceeded on to an isolated house in a white Lincoln automobile that the brothers had parked at a hospital near the prison. At the house, the Lincoln automobile had a flat tire; the only spare tire was pressed into service. After two nights at the house, the group drove toward Flagstaff. As the group traveled on back roads and secondary highways through the desert, another tire blew out. The group de-

cided to flag down a passing motorist and steal a car. Raymond stood out in front of the Lincoln; the other four armed themselves and lay in wait by the side of the road. One car passed by without stopping, but a second car, a Mazda occupied by John Lyons, his wife Donnelda, his 2-year-old son Christopher, and his 15-year-old niece, Theresa Tyson, pulled over to render aid.

As Raymond showed John Lyons the flat tire on the Lincoln, the other Tisons and Greenawalt emerged. The Lyons family was forced into the backseat of the Lincoln. Raymond and Donald drove the Lincoln down a dirt road off the highway and then down a gas line service road farther into the desert; Gary Tison, Ricky Tison, and Randy Greenawalt followed in the Lyons' Mazda. The two cars were parked trunk to trunk and the Lyons family was ordered to stand in front of the Lincoln's headlights. The Tisons transferred their belongings from the Lincoln into the Mazda. They discovered guns and money in the Mazda which they kept, and they put the rest of the Lyons' possessions in the Lincoln.

Gary Tison then told Raymond to drive the Lincoln still farther into the desert. Raymond did so, and, while the others guarded the Lyons and Theresa Tyson, Gary fired his shotgun into the radiator, presumably to completely disable the vehicle. The Lyons and Theresa Tyson were then escorted to the Lincoln and again ordered to stand in its headlights. Ricky Tison reported that John Lyons begged, in comments "more or less directed at everybody," "Jesus, don't kill me." Gary Tison said he was "thinking about it." App. 39, 108. John Lyons asked the Tisons and Greenawalt to "[g]ive us some water . . . just leave us out here, and you all go home." Gary Tison then told his sons to go back to the Mazda and get some water. Raymond later explained that his father "was like in conflict with himself . . . . What it was, I think it was the baby being there and all this, and he wasn't sure about what to do." *Id.*, at 20–21, 74.

The petitioners' statements diverge to some extent, but it appears that both of them went back towards the Mazda, along with Donald, while Randy Greenawalt and Gary Tison stayed at the Lincoln guarding the victims. Raymond recalled being at the Mazda filling the water jug "when we started hearing the shots." *Id.*, at 21. Ricky said that the brothers gave the water jug to Gary Tison who then, with Randy Greenawalt went behind the Lincoln, where they spoke briefly, then raised the shotguns and started firing. *Id.*, at 41, 111. In any event, petitioners agree they saw Greenawalt and their father brutally murder their four captives with repeated blasts from their shotguns. Neither made an effort to help the victims, though both later stated they were surprised by the shooting. The Tisons got into the Mazda and drove away, continuing their flight. Physical evidence suggested that Theresa Tyson managed to crawl away from the bloodbath, severely injured. She died in the desert after the Tisons left.

Several days later the Tisons and Greenawalt were apprehended after a shootout at a police roadblock. Donald Tison was killed. Gary Tison escaped into the desert where he subsequently died of exposure. Raymond and Ricky Tison and Randy Greenawalt were captured and tried jointly for the crimes associated with the prison break itself and the shootout at the roadblock; each was convicted and sentenced.

The State then individually tried each of the petitioners for capital murder of the four victims as well as for the associated crimes of armed robbery, kidnaping, and car theft. The capital murder charges were based on Arizona felony-murder law providing that a killing occurring during the perpetration of robbery or kidnaping is capital murder, Ariz. Rev. Stat. Ann. § 13–452 (1956) (repealed 1978), and that each participant in the kidnaping or robbery is legally responsible for the acts of his accomplices. Ariz. Rev. Stat. Ann. § 13–139 (1956) (repealed 1978). Each of the petitioners was con-

victed of the four murders under these accomplice liability and felony-murder statutes.[1]

Arizona law also provided for a capital sentencing proceeding, to be conducted without a jury, to determine whether the crime was sufficiently aggravated to warrant the death sentence. Ariz. Rev. Stat. Ann. § 13–454(A) (Supp. 1973) (repealed 1978). The statute set out six aggravating and four mitigating factors. Ariz. Rev. Stat. Ann. §§ 13–454(E), (F) (Supp. 1973) (repealed 1978). The judge found three statutory aggravating factors:

(1) the Tisons had created a grave risk of death to others (not the victims);

(2) the murders had been committed for pecuniary gain;

(3) the murders were especially heinous.

The judge found no statutory mitigating factor. Importantly, the judge specifically found that the crime was *not* mitigated by the fact that each of the petitioners' "participation was relatively minor." Ariz. Rev. Stat. Ann. § 13–454(F)(3) (Supp. 1973) (repealed 1978). Rather, he found that the "participation of each [petitioner] in the crimes giving rise to the application of the felony murder rule in this case was very substantial." App. 284–285. The trial judge also specifically found, *id.*, at 285, that each "could reasonably have foreseen that his conduct . . . would cause or create a grave risk of . . . death." Ariz. Rev. Stat. Ann. § 13–454(F)(4) (Supp. 1973) (repealed 1978). He did find, however, three nonstatutory mitigating factors:

(1) the petitioners' youth—Ricky was 20 and Raymond was 19;

---

[1] Arizona has recodified and broadened its felony-murder statute to include killings occurring during the course of a variety of sex and narcotics offenses and escape. See Ariz. Rev. Stat. Ann. §§ 13–1105(A)(2), (B) (Supp. 1986). The accomplice liability provisions of Arizona law have been modernized and recodified also. See Ariz. Rev. Stat. Ann. §§ 13–301, 13–303(A)(3), (B)(2) (1978 and Supp. 1986). Neither change would have diminished Ricky Tison's or Raymond Tison's legal accountability for the deaths that occurred.

(2) neither had prior felony records;

(3) each had been convicted of the murders under the felony-murder rule.

Nevertheless, the judge sentenced both petitioners to death.

On direct appeal, the Arizona Supreme Court affirmed. The Court found:

> "The record establishes that both Ricky and Raymond Tison were present when the homicides took place and that they occurred as part of and in the course of the escape and continuous attempt to prevent recapture. The deaths would not have occurred but for their assistance. That they did not specifically intend that the Lyonses and Theresa Tyson die, that they did not plot in advance that these homicides would take place, or that they did not actually pull the triggers on the guns which inflicted the fatal wounds is of little significance." *State* v. *(Ricky Wayne) Tison*, 129 Ariz. 526, 545, 633 P. 2d 335, 354 (1981).

In evaluating the trial court's findings of aggravating and mitigating factors, the Arizona Supreme Court found the first aggravating factor—creation of grave risk to others—not supported by the evidence. All those killed were intended victims, and no one else was endangered. The Arizona Supreme Court, however, upheld the "pecuniary gain" and "heinousness" aggravating circumstances and the death sentences. This Court denied the Tisons' petition for certiorari. 459 U. S. 882 (1982).

Petitioners then collaterally attacked their death sentences in state postconviction proceedings alleging that *Enmund* v. *Florida*, 458 U. S. 782 (1982), which had been decided in the interim, required reversal. A divided Arizona Supreme Court, interpreting *Enmund* to require a finding of "intent to kill," declared in Raymond Tison's case "the dictate of *Enmund* is satisfied," writing:

"Intend *[sic]* to kill includes the situation in which the defendant intended, contemplated, or anticipated that lethal force would or might be used or that life would or might be taken in accomplishing the underlying felony. *Enmund, supra; State* v. *Emery,* [141 Ariz. 549, 554, 688 P. 2d 175, 180 (1984)] filed June 6, 1984.

"In the present case the evidence does not show that petitioner killed or attempted to kill. The evidence does demonstrate beyond a reasonable doubt, however, that petitioner intended to kill. Petitioner played an active part in preparing the breakout, including obtaining a getaway car and various weapons. At the breakout scene itself, petitioner played a crucial role by, among other things, holding a gun on prison guards. Petitioner knew that Gary Tison's murder conviction arose out of the killing of a guard during an earlier prison escape attempt. Thus petitioner could anticipate the use of lethal force during this attempt to flee confinement; in fact, he later said that during the escape he would have been willing personally to kill in a 'very close life or death situation,' and that he recognized that after the escape there was a possibility of killings.

"The use of lethal force that petitioner contemplated indeed occurred when the gang abducted the people who stopped on the highway to render aid. Petitioner played an active part in the events that led to the murders. He assisted in the abduction by flagging down the victims as they drove by, while the other members of the gang remained hidden and armed. He assisted in escorting the victims to the murder site. At the site, petitioner, Ricky Tison and Greenawalt placed the gang's possessions in the victims' Mazda and the victims' possessions in the gang's disabled Lincoln Continental. After Gary Tison rendered the Lincoln inoperable by firing into its engine compartment, petitioner assisted in escorting the victims to the Lincoln. Petitioner then

watched Gary Tison and Greenawalt fire in the direction of the victims. Petitioner did nothing to interfere. After the killings, petitioner did nothing to disassociate himself from Gary Tison and Greenawalt, but instead used the victims' car to continue on the joint venture, a venture that lasted several more days.

"From these facts we conclude that petitioner intended to kill. Petitioner's participation up to the moment of the firing of the fatal shots was substantially the same as that of Gary Tison and Greenawalt. . . . Petitioner, actively participated in the events leading to death by, *inter alia*, providing the murder weapons and helping abduct the victims. Also petitioner was present at the murder site, did nothing to interfere with the murders, and after the murders even continued on the joint venture.

". . . In *Enmund*, unlike in the present case, the defendant did not actively participate in the events leading to death (by, for example, as in the present case, helping abduct the victims) and was not present at the murder site." 142 Ariz. 454, 456–457, 690 P. 2d 755, 757–758 (1984).

In Ricky Tison's case the Arizona Supreme Court relied on a similar recitation of facts to find intent. It found that though Ricky Tison had not said that he would have been willing to kill, he "could anticipate the use of lethal force during this attempt to flee confinement." 142 Ariz. 446, 448, 690 P. 2d 747, 749 (1984). The court noted that Ricky Tison armed himself and hid on the side of the road with the others while Raymond flagged down the Lyons family. Ricky claimed to have a somewhat better view than Raymond did of the actual killing. Otherwise, the court noted, Ricky Tison's participation was substantially the same as Raymond's. *Id.*, at 447–448, 690 P. 2d, at 748–749. We granted certiorari in

order to consider the Arizona Supreme Court's application of *Enmund.* 475 U. S. 1010 (1986).[2]

## II

In *Enmund* v. *Florida,* this Court reversed the death sentence of a defendant convicted under Florida's felony-murder rule. Enmund was the driver of the "getaway" car in an armed robbery of a dwelling. The occupants of the house, an elderly couple, resisted and Enmund's accomplices killed them. The Florida Supreme Court found the inference that Enmund was the person in the car by the side of the road waiting to help his accomplices escape sufficient to support his sentence of death:

"'[T]he only evidence of the degree of [Enmund's] participation is the jury's likely inference that he was the person in the car by the side of the road near the scene of the crimes. The jury could have concluded that he was there, a few hundred feet away, waiting to help the robbers escape with the Kerseys' money. The evidence, therefore, was sufficient to find that the appellant was a principal of the second degree, constructively present aiding and abetting the commission of the crime of robbery. This conclusion supports the verdicts of murder in the first degree on the basis of the felony murder por-

---

[2] Petitioners devote a substantial portion of their brief on the merits to arguing that Arizona has given an unconstitutionally broad construction to the aggravating factors in its capital sentencing statute. See *Godfrey* v. *Georgia,* 446 U. S. 420 (1980). This Court granted certiorari on the following question:

"Is the December 4, 1984 decision of the Arizona Supreme Court to execute petitioners in conflict with the holding of *Enmund* v. *Florida,* 458 U. S. 782 (1982), where—in words of the Arizona Supreme Court—petitioners 'did not specifically intend that the [victims] die, . . . did not plot in advance that these homicides would take place, or . . . did not actually pull the triggers on the guns which inflicted the fatal wounds . . . .'" Pet. for Cert. 2. In our view, the question presented does not fairly encompass an attack on Arizona's construction of its aggravating factors and we express no view on that subject. See this Court's Rule 21.1(a).

tion of section 782.04(1)(a).' 399 So. 2d, at 1370."
*Enmund* v. *Florida*, 458 U. S., at 786.

This Court, citing the weight of legislative and community opinion, found a broad societal consensus, with which it agreed, that the death penalty was disproportional to the crime of robbery-felony murder "in these circumstances." *Id.*, at 788. The Court noted that although 32 American jurisdictions permitted the imposition of the death penalty for felony murders under a variety of circumstances, Florida was 1 of only 8 jurisdictions that authorized the death penalty "solely for participation in a robbery in which another robber takes life." *Id.*, at 789. Enmund was, therefore, sentenced under a distinct minority regime, a regime that permitted the imposition of the death penalty for felony murder *simpliciter*. At the other end of the spectrum, eight States required a finding of intent to kill before death could be imposed in a felony-murder case and one State required actual participation in the killing. The remaining States authorizing capital punishment for felony murders fell into two somewhat overlapping middle categories: three authorized the death penalty when the defendant acted with recklessness or extreme indifference to human life, and nine others, including Arizona, required a finding of some aggravating factor beyond the fact that the killing had occurred during the course of a felony before a capital sentence might be imposed. Arizona fell into a subcategory of six States which made "minimal participation in a capital felony committed by another person a [statutory] mitigating circumstance." *Id.*, at 792. Two more jurisdictions required a finding that the defendant's participation in the felony was not "relatively minor" before authorizing a capital sentence. *Id.*, at 791.[3]

---

[3] Vermont fell into none of these categories. Vermont limited the death penalty to defendants who commit a second unrelated murder or murder a correctional officer. See *Enmund* v. *Florida*, 458 U. S. 782, 791, n. 11 (1982).

After surveying the States' felony-murder statutes, the *Enmund* Court next examined the behavior of juries in cases like Enmund's in its attempt to assess American attitudes toward capital punishment in felony-murder cases. Of 739 death row inmates, only 41 did not participate in the fatal assault. All but 16 of these were physically present at the scene of the murder and of these only 3, including Enmund, were sentenced to death in the absence of a finding that they had collaborated in a scheme designed to kill. The Court found the fact that only 3 of 739 death row inmates had been sentenced to death absent an intent to kill, physical presence, or direct participation in the fatal assault persuasive evidence that American juries considered the death sentence disproportional to felony murder *simpliciter*.

Against this background, the Court undertook its own proportionality analysis. Armed robbery is a serious offense, but one for which the penalty of death is plainly excessive; the imposition of the death penalty for robbery, therefore, violates the Eighth and Fourteenth Amendments' proscription "'against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged.'" *Weems* v. *United States*, 217 U. S. 349, 371 (1910) (quoting *O'Neil* v. *Vermont*, 144 U. S. 323, 339–340 (1892)); cf. *Coker* v. *Georgia*, 433 U. S. 584 (1977) (holding the death penalty disproportional to the crime of rape). Furthermore, the Court found that Enmund's degree of participation in *the murders* was so tangential that it could not be said to justify a sentence of death. It found that neither the deterrent nor the retributive purposes of the death penalty were advanced by imposing the death penalty upon Enmund. The *Enmund* Court was unconvinced "that the threat that the death penalty will be imposed for murder will measurably deter one who does not kill and has no intention or purpose that life will be taken." 458 U. S., at 798–799. In reaching this conclusion, the Court relied upon the fact that killing only rarely occurred during the course of robber-

ies, and such killing as did occur even more rarely resulted in death sentences if the evidence did not support an inference that the defendant intended to kill. The Court acknowledged, however, that "[i]t would be very different if the likelihood of a killing in the course of a robbery were so substantial that one should share the blame for the killing if he somehow participated in the felony." *Id.*, at 799.

That difference was also related to the second purpose of capital punishment, retribution. The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender. While the States generally have wide discretion in deciding how much retribution to exact in a given case, the death penalty, "unique in its severity and irrevocability," *Gregg* v. *Georgia*, 428 U. S. 153, 187 (1976), requires the State to inquire into the relevant facets of "the character and record of the individual offender." *Woodson* v. *North Carolina*, 428 U. S. 280, 304 (1976). Thus, in Enmund's case, "the focus [had to] be on *his* culpability, not on that of those who committed the robbery and shot the victims, for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence.'" *Enmund* v. *Florida, supra,* at 798 (quoting *Lockett* v. *Ohio*, 438 U. S. 586, 605 (1978)) (emphasis in original). Since Enmund's own participation in the felony murder was so attenuated and since there was no proof that Enmund had any culpable mental state, *Enmund* v. *Florida, supra,* at 790–791, the death penalty was excessive retribution for his crimes.

*Enmund* explicitly dealt with two distinct subsets of all felony murders in assessing whether Enmund's sentence was disproportional under the Eighth Amendment. At one pole was Enmund himself: the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state. Only a small minority of States even authorized the death penalty in such circumstances and even within those jurisdictions the death

penalty was almost never exacted for such a crime. The Court held that capital punishment was disproportional in these cases. *Enmund* also clearly dealt with the other polar case: the felony murderer who actually killed, attempted to kill, or intended to kill. The Court clearly held that the equally small minority of jurisdictions that limited the death penalty to these circumstances could continue to exact it in accordance with local law when the circumstances warranted. The Tison brothers' cases fall into neither of these neat categories.

Petitioners argue strenuously that they did not "intend to kill" as that concept has been generally understood in the common law. We accept this as true. Traditionally, "one intends certain consequences when he desires that his acts cause those consequences or knows that those consequences are substantially certain to result from his acts." W. LaFave & A. Scott, Criminal Law § 28, p. 196 (1972); see *Lockett* v. *Ohio, supra,* at 625–626 (1978) (opinion of WHITE, J.) (equating intent with purposeful conduct); see also Perkins, A Rationale of Mens Rea, 52 Harv. L. Rev. 905, 911 (1939). As petitioners point out, there is no evidence that either Ricky or Raymond Tison took any act which he desired to, or was substantially certain would, cause death.

The Arizona Supreme Court did not attempt to argue that the facts of this case supported an inference of "intent" in the traditional sense. Instead, the Arizona Supreme Court attempted to reformulate "intent to kill" as a species of foreseeability. The Arizona Supreme Court wrote:

> "Intend *[sic]* to kill includes the situation in which the defendant intended, contemplated, or anticipated that lethal force would or might be used or that life would or might be taken in accomplishing the underlying felony." 142 Ariz., at 456, 690 P. 2d, at 757.

This definition of intent is broader than that described by the *Enmund* Court. Participants in violent felonies like armed robberies can frequently "anticipat[e] that lethal force . . .

might be used . . . in accomplishing the underlying felony."
Enmund himself may well have so anticipated. Indeed, the
possibility of bloodshed is inherent in the commission of any
violent felony and this possibility is generally foreseeable and
foreseen; it is one principal reason that felons arm them-
selves. The Arizona Supreme Court's attempted reformula-
tion of intent to kill amounts to little more than a restatement
of the felony-murder rule itself. Petitioners do not fall
within the "intent to kill" category of felony murderers for
which *Enmund* explicitly finds the death penalty permissible
under the Eighth Amendment.

On the other hand, it is equally clear that petitioners also
fall outside the category of felony murderers for whom
*Enmund* explicitly held the death penalty disproportional:
their degree of participation in the crimes was major rather
than minor, and the record would support a finding of the cul-
pable mental state of reckless indifference to human life.
We take the facts as the Arizona Supreme Court has given
them to us. *Cabana* v. *Bullock*, 474 U. S. 376 (1986).

Raymond Tison brought an arsenal of lethal weapons into
the Arizona State Prison which he then handed over to two
convicted murderers, one of whom he knew had killed a
prison guard in the course of a previous escape attempt. By
his own admission he was prepared to kill in furtherance of
the prison break. He performed the crucial role of flagging
down a passing car occupied by an innocent family whose fate
was then entrusted to the known killers he had previously
armed. He robbed these people at their direction and then
guarded the victims at gunpoint while they considered what
next to do. He stood by and watched the killing, making no
effort to assist the victims before, during, or after the shoot-
ing. Instead, he chose to assist the killers in their continu-
ing criminal endeavors, ending in a gun battle with the police
in the final showdown.

Ricky Tison's behavior differs in slight details only. Like
Raymond, he intentionally brought the guns into the prison

to arm the murderers. He could have foreseen that lethal force might be used, particularly since he knew that his father's previous escape attempt had resulted in murder. He, too, participated fully in the kidnaping and robbery and watched the killing after which he chose to aid those whom he had placed in the position to kill rather than their victims.

These facts not only indicate that the Tison brothers' participation in the crime was anything but minor; they also would clearly support a finding that they both subjectively appreciated that their acts were likely to result in the taking of innocent life. The issue raised by this case is whether the Eighth Amendment prohibits the death penalty in the intermediate case of the defendant whose participation is major and whose mental state is one of reckless indifference to the value of human life. *Enmund* does not specifically address this point. We now take up the task of determining whether the Eighth Amendment proportionality requirement bars the death penalty under these circumstances.

Like the *Enmund* Court, we find the state legislatures' judgment as to proportionality in these circumstances relevant to this constitutional inquiry.[4] The largest number of States still fall into the two intermediate categories discussed in *Enmund*. Four States authorize the death penalty in

---

[4] The state statutes discussed in *Enmund* v. *Florida* are largely unchanged. Mississippi and Nevada have modified their statutes to require a finding that the defendant killed, attempted to kill, or intended to kill, or that lethal force be employed, presumably in light of *Enmund*. Miss. Code Ann. § 99–19–101(7) (Supp. 1986); Nev. Rev. Stat. §§ 200.030(1)(b), 200.030(4), 200.033(4)(a)–(b) (1985). New Jersey has joined the ranks of the States imposing capital punishment in intentional murders but not felony murders. N. J. Stat. Ann. §§ 2C:11–3a(a), (c) (West Supp. 1986). Oregon now authorizes capital punishment for felony murders when the defendant intends to kill. Ore. Rev. Stat. §§ 163.095(d), 163.115(1)(b) (1985). Vermont has further narrowed the circumstances in which it authorizes capital punishment: now only the murderers of correctional officers may be subject to death. Vt. Stat. Ann., Tit. 13, §§ 2303(b), (c) (Supp. 1986).

felony-murder cases upon a showing of culpable mental state such as recklessness or extreme indifference to human life.[5] Two jurisdictions require that the defendant's participation be substantial[6] and the statutes of at least six more, including Arizona, take minor participation in the felony expressly into account in mitigation of the murder.[7] These requirements significantly overlap both in this case and in general, for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life. At a minimum, however, it can be said that all these jurisdictions, as well as six States which *Enmund* classified along with Florida as permitting capital punishment for felony murder *simpliciter*,[8] and the three States which simply require some additional aggravation before imposing the death penalty upon a felony murderer,[9]

---

[5] Ark. Stat. Ann. § 41–1501(1)(a) (1977 and Supp. 1985); Del. Code Ann., Tit. 11, §§ 636(a)(2), (b) (1979); Ky. Rev. Stat. § 507.020(1)(b) (1985); Ill. Rev. Stat., ch. 38, ¶¶ 9–1(a)(3), 9–1(b)(6) (1986).

[6] Conn. Gen. Stat. § 53a–46a(g)(4) (1985); 49 U. S. C. App. § 1473(c) (6)(D).

[7] Ariz. Rev. Stat. Ann. § 13–703(G)(3) (1978 and Supp. 1986); Colo. Rev. Stat. § 16–11–103(5)(d) (1978 and Supp. 1985); Ind. Code § 35–50–2–9(c)(4) (Supp. 1986); Mont. Code Ann. § 46–18–304(6) (1985); Neb. Rev. Stat. § 29–2523(2)(e) (1985); N. C. Gen. Stat. § 15A–2000(f)(4) (1983).

[8] Cal. Penal Code Ann. §§ 189, 190.2(a)(17) (West Supp. 1987); Fla. Stat. §§ 782.04(1)(a), 775.082(1), 921.141(5)(d) (1985); Ga. Code §§ 16–5–1(a), 17–10–30(b)(2) (1984 and 1982); S. C. Code §§ 16–3–10, 16–3–20(C)(a)(1) (1985 and Supp. 1986); Tenn. Code Ann. §§ 39–2–202(a), 39–2–203(i)(7) (1982); Wyo. Stat. §§ 6–2–101, 6–2–102(h)(iv) (1983).

The dissent objects to our classification of California among the States whose statutes authorize capital punishment for felony murder *simpliciter* on the ground that the California Supreme Court in *Carlos* v. *Superior Court*, 35 Cal. 3d 131, 672 P. 2d 862 (1983), construed its capital murder statute to require a finding of intent to kill. *Post*, at 175, n. 13. But the California Supreme Court only did so in light of perceived federal constitutional limitations stemming from our then recent decision in *Enmund*. See *Carlos* v. *Superior Court, supra*, at 147–152, 672 P. 2d, at 873–877.

[9] Idaho Code § 19–2515(g) (Supp. 1986); Okla. Stat., Tit. 21, § 701.12 (1981); S. D. Codified Laws § 23A–27A–1 (Supp. 1986).

specifically authorize the death penalty in a felony-murder case where, though the defendant's mental state fell short of intent to kill, the defendant was a major actor in a felony in which he knew death was highly likely to occur.   On the other hand, even after *Enmund*, only 11 States authorizing capital punishment forbid imposition of the death penalty even though the defendant's participation in the felony murder is major and the likelihood of killing is so substantial as to raise an inference of extreme recklessness.[10]   This substantial and recent legislative authorization of the death penalty for the crime of felony murder regardless of the absence of a finding of an intent to kill powerfully suggests that our society does *not* reject the death penalty as grossly excessive under these circumstances, *Gregg* v. *Georgia*, 428 U. S., at 179–181 (opinion of Stewart, POWELL, and STEVENS, JJ.); see also *Coker* v. *Georgia*, 433 U. S., at 594.

Moreover, a number of state courts have interpreted *Enmund* to permit the imposition of the death penalty in such aggravated felony murders.   We do not approve or disapprove the judgments as to proportionality reached on the particular facts of these cases, but we note the apparent consensus that substantial participation in a violent felony under circumstances likely to result in the loss of innocent human life may justify the death penalty even absent an "intent to kill."   See, *e. g.*, *Clines* v. *State*, 280 Ark. 77, 84, 656 S. W. 2d 684, 687 (1983) (armed, forced entry, nighttime robbery of private dwelling known to be occupied plus evidence that kill-

---

[10] Ala. Code §§ 13A–2–23, 13A–5–40(a)(2), (b), 13A–5–51, 13A–6–2(a)(2) (1982 and Supp. 1986); La. Rev. Stat. Ann. § 14:30(A)(1) (West 1986); Miss. Code Ann. § 99–19–101(7) (Supp. 1986); Nev. Rev. Stat. §§ 200.030(1)(b), 200.030(4), 200.033(4)(a)–(b) (1986); N. J. Stat. Ann. §§ 2C:11–3a(a), (c) (West Supp. 1986) (felony murder not capital); N. M. Stat. Ann. §§ 30–2–1 (A)(2), 31–20A–5 (1984); Ohio Rev. Code Ann. §§ 2903.01(B)–(D), 2929.02 (A), 2929.04(A)(7) (1982); Ore. Rev. Stat. §§ 163.095(d), 163.115(1)(b) (1985); Tex. Penal Code Ann. §§ 19.02(a), 19.03(a)(2) (1974 and Supp. 1986); Utah Code Ann. § 76–5–202(1) (Supp. 1986); Va. Code § 18.2–31 (Supp. 1986).

ing contemplated), cert. denied, 465 U. S. 1051 (1984); *Deputy* v. *State*, 500 A. 2d 581, 599–600 (Del. 1985) (defendant present at scene; robbed victims; conflicting evidence as to participation in killing), cert. pending, No. 85–6272; *Ruffin* v. *State*, 420 So. 2d 591, 594 (Fla. 1982) (defendant present, assisted codefendant in kidnaping, raped victim, made no effort to interfere with codefendant's killing victim and continued on the joint venture); *People* v. *Davis*, 95 Ill. 2d 1, 52, 447 N. E. 2d 353, 378 (defendant present at the scene and had participated in other crimes with Holman, the triggerman, during which Holman had killed under similar circumstances), cert. denied, 464 U. S. 1001 (1983); *Selvage* v. *State*, 680 S. W. 2d 17, 22 (Tex. Cr. App. 1984) (participant in jewelry store robbery during the course of which a security guard was killed; no evidence that defendant himself shot the guard but he did fire a weapon at those who gave chase); see also *Allen* v. *State*, 253 Ga. 390, 395, n. 3, 321 S. E. 2d 710, 715, n. 3 (1984) ("The result in *[Enmund* v. *Florida]* does not turn on the mere fact that Enmund was convicted of felony murder.  It is important to note how attenuated was Enmund's responsibility for the deaths of the victims in that case"), cert. denied, 470 U. S. 1059 (1985).

Against this backdrop, we now consider the proportionality of the death penalty in these midrange felony-murder cases for which the majority of American jurisdictions clearly authorize capital punishment and for which American courts have not been nearly so reluctant to impose death as they are in the case of felony murder *simpliciter*.[11]

---

[11] The fact that the Arizona Supreme Court purported to find "intent to kill" before affirming death sentences after *Enmund* provides no support for the proposition that it ordinarily has considered major participation in a violent felony resulting in death combined with a reckless indifference towards human life insufficient to support a capital sentence.  Cf. *post*, at 178–179, and n. 17.  The Arizona Supreme Court has made formal findings of "intent to kill" to comply with the perceived "dictate of *Enmund*."  142 Ariz. 454, 456, 690 P. 2d 755, 758 (1984).  In fact, the standard applied by the Arizona Supreme Court was *not* a classic intent one, but rather was

A critical facet of the individualized determination of culpability required in capital cases is the mental state with which the defendant commits the crime. Deeply ingrained in our legal tradition is the idea that the more purposeful is the criminal conduct, the more serious is the offense, and, therefore, the more severely it ought to be punished. The ancient concept of malice aforethought was an early attempt to focus on mental state in order to distinguish those who deserved death from those who through "Benefit of . . . Clergy" would be spared. 23 Hen. 8, ch. 1, §§ 3, 4 (1531); 1 Edw. 6, ch. 12, § 10 (1547). Over time, malice aforethought came to be inferred from the mere act of killing in a variety of circumstances; in reaction, Pennsylvania became the first American jurisdiction to distinguish between degrees of murder, reserving capital punishment to "wilful, deliberate and premeditated" killings and felony murders. 3 Pa. Laws 1794, ch. 1766, pp. 186–187 (1810). More recently, in *Lockett* v. *Ohio*, 438 U. S. 586 (1978), the plurality opinion made clear that the defendant's mental state was critical to weighing a defendant's culpability under a system of guided discretion, vacating a death sentence imposed under an Ohio statute that did not permit the sentencing authority to take into account "[t]he absence of direct proof that the defendant intended to cause the death of the victim." *Id.*, at 608 (opinion of Burger, C. J.); see also *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982) (adopting position of *Lockett* plurality). In *Enmund* v. *Florida*, the Court recognized again the importance of mental state, explicitly permitting the death penalty in at least those cases where the felony murderer intended to kill and forbidding it in the case of a minor actor not shown to have had any culpable mental state.

---

whether "a defendant contemplated, anticipated, or intended that lethal force would or might be used." *State* v. *Emery*, 141 Ariz. 549, 554, 688 P. 2d 175, 180 (1984). As we have shown, *supra*, at 150, this standard amounted to little more than a requirement that killing be foreseeable.

A narrow focus on the question of whether or not a given defendant "intended to kill," however, is a highly unsatisfactory means of definitively distinguishing the most culpable and dangerous of murderers. Many who intend to, and do, kill are not criminally liable at all—those who act in self-defense or with other justification or excuse. Other intentional homicides, though criminal, are often felt undeserving of the death penalty—those that are the result of provocation. On the other hand, some nonintentional murderers may be among the most dangerous and inhumane of all—the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an "intent to kill." Indeed it is for this very reason that the common law and modern criminal codes alike have classified behavior such as occurred in this case along with intentional murders. See, *e. g.*, G. Fletcher, Rethinking Criminal Law § 6.5, pp. 447–448 (1978) ("[I]n the common law, intentional killing is not the only basis for establishing the most egregious form of criminal homicide . . . . For example, the Model Penal Code treats reckless killing, 'manifesting extreme indifference to the value of human life,' as equivalent to purposeful and knowing killing"). *Enmund* held that when "intent to kill" results in its logical though not inevitable consequence—the taking of human life—the Eighth Amendment permits the State to exact the death penalty after a careful weighing of the aggravating and mitigating circumstances. Similarly, we hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capi-

tal sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

The petitioners' own personal involvement in the crimes was not minor, but rather, as specifically found by the trial court, "substantial." Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, each petitioner was actively involved in every element of the kidnaping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder of the Lyons family and the subsequent flight. The Tisons' high level of participation in these crimes further implicates them in the resulting deaths. Accordingly, they fall well within the overlapping second intermediate position which focuses on the defendant's degree of participation in the felony.

Only a small minority of those jurisdictions imposing capital punishment for felony murder have rejected the possibility of a capital sentence absent an intent to kill, and we do not find this minority position constitutionally required. We will not attempt to precisely delineate the particular types of conduct and states of mind warranting imposition of the death penalty here. Rather, we simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement.[12] The Arizona courts have clearly found that the former exists; we now vacate the judgments below and remand for determination of the latter in further proceedings not inconsistent with this opinion. *Cabana* v. *Bullock*, 474 U. S. 376 (1986).

*It is so ordered.*

---

[12] Although we state these two requirements separately, they often overlap. For example, we do not doubt that there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life. Moreover, even in cases where the fact that the defendant was a major participant in a felony did not suffice to establish reckless indifference, that fact would still often provide significant support for such a finding.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, and with whom JUSTICE BLACKMUN and JUSTICE STEVENS join as to Parts I through IV-A, dissenting.

The murders that Gary Tison and Randy Greenawalt committed revolt and grieve all who learn of them. When the deaths of the Lyons family and Theresa Tyson were first reported, many in Arizona erupted "in a towering yell" for retribution and justice.[1] Yet Gary Tison, the central figure in this tragedy, the man who had his family arrange his and Greenawalt's escape from prison, and the man who chose, with Greenawalt, to murder this family while his sons stood by, died of exposure in the desert before society could arrest him and bring him to trial. The question this case presents is what punishment Arizona may constitutionally exact from two of Gary Tison's sons for their role in these events. Because our precedents and our Constitution compel a different answer than the one the Court reaches today, I dissent.

## I

Under the felony-murder doctrine, a person who commits a felony is liable for *any* murder that occurs during the commission of that felony, regardless of whether he or she commits, attempts to commit, or intended to commit that murder. The doctrine thus imposes liability on felons for killings committed by cofelons during a felony. This curious doctrine is a living fossil from a legal era in which all felonies were punishable by death; in those circumstances, the state of mind of the felon with respect to the murder was understandably superfluous, because he or she could be executed simply for intentionally committing the felony.[2] Today, in

---

[1] App. 297 (quoting Paul Dean in the Arizona Republic, Aug. 16, 1978).

[2] As explained in the Commentaries on the Model Penal Code: "At common law all felonies were punishable by death. In a felony-murder situation, it made little difference whether the actor was convicted of murder or of the underlying felony because the sanction was the same. The primary use of the felony-murder rule at common law therefore was to deal with a homicide that occurred in furtherance of an attempted felony that failed. Since attempts were punished as misdemeanors, . . . the use of the felony-

most American jurisdictions and in virtually all European and Commonwealth countries, a felon cannot be executed for a murder that he or she did not commit or specifically intend or attempt to commit. In some American jurisdictions, however, the authority to impose death in such circumstances still persists. Arizona is such a jurisdiction.

The proceedings below illustrate how, under the felony-murder doctrine, a defendant may be held liable and sentenced to death for a murder that he or she neither committed nor intended to commit. The prosecutor argued to the jury that it did not matter that Gary Tison and Randy Greenawalt had caused the killings, because under the felony-murder rule the Tisons could nonetheless be found legally responsible for those killings. App. 173–174, 185, 191. The trial judge's instructions were consistent with the prosecutor's argument. *Id.*, at 179, 218–219. In sentencing petitioners, the trial court did not find that they had killed, attempted to kill, or intended to kill anyone. *Id.*, at 280–289. Nevertheless, the court upheld the jury's verdict that Ricky and Raymond Tison were liable under the felony-murder doctrine for the murders that their father and Randy Greenawalt had committed. Furthermore, the court found as an aggravating factor *against petitioners* the "heinous, cruel and depraved manner" in which Gary Tison and Randy Greenawalt carried out the murders. *Id.*, at 282–283. As a result, the court imposed the death sentence.[3]

---

murder rule allowed the courts to punish the actor in the same manner as if his attempt had succeeded. Thus, a conviction for attempted robbery was a misdemeanor, but a homicide committed in the attempt was murder and punishable by death." ALI, Model Penal Code Commentaries § 210.2, p. 31, n. 74 (Off. Draft 1980).

[3] As the Court notes, *ante*, at 146, n. 2, it has expressed no view on the constitutionality of Arizona's decision to attribute to petitioners as an aggravating factor the manner in which other individuals carried out the killings. On its face, however, that decision would seem to violate the core Eighth Amendment requirement that capital punishment be based on an "individualized consideration" of the defendant's culpability, *Lockett* v.

The Arizona Supreme Court affirmed. It held that the Tisons "did not specifically intend that the Lyons and Theresa Tyson die, that they did not plot in advance that these homicides would take place, [and] that they did not actually pull the triggers on the guns which inflicted the fatal wounds. . . ." *State* v. *Tison*, 129 Ariz. 526, 545, 633 P. 2d 335, 354 (1981). The court found these facts to be "of little significance," however, because "the non-participation in the shooting was not controlling since both [brothers] took part in the robbery, the kidnapping, and were present assisting in the detention of the Lyonses and Theresa Tyson while the homicides were committed." *State* v. *Tison*, 129 Ariz. 546, 556, 633 P. 2d 355, 365 (1981). Thus, while the Arizona courts acknowledged that petitioners had neither participated in the shootings nor intended that they occur, those courts nonetheless imposed the death sentence under the theory of felony murder.

After the decision of the Arizona Supreme Court, this Court addressed, in *Enmund* v. *Florida*, 458 U. S. 782 (1982), the question "whether death is a valid penalty under the Eighth and Fourteenth Amendments for one who neither took life, attempted to take life, nor intended to take life." *Id.*, at 787. The question arose because the Florida Supreme Court affirmed the death sentence for Earl Enmund, an accomplice in an armed robbery in which his two cofelons had killed the two individuals that the felons had intended to rob. Enmund did not shoot anyone, and there was nothing in the record concerning Enmund's mental state with regard to the killings, but the Florida Supreme Court had held him strictly liable for the killings under the felony-murder doctrine. *Enmund* v. *State*, 399 So. 2d 1362, 1369 (1981).

---

*Ohio*, 438 U. S. 586, 605 (1978). It therefore remains open to the state courts to consider whether Arizona's aggravating factors were interpreted and applied so broadly as to violate the Constitution. *Godfrey* v. *Georgia*, 446 U. S. 420 (1980).

In reversing the Florida Supreme Court, this Court took note of the "overwhelming evidence" of "[s]ociety's rejection of the death penalty for accomplice liability in felony murders." 458 U. S., at 794. The Court observed that, in imposing the death penalty upon Enmund, the Florida Supreme Court had failed to focus on "Enmund's own conduct . . . [and] on *his* culpability." *Id.*, at 798 (emphasis in original). The Court then explained, and rejected, the felony-murder doctrine as a theory of capital culpability.

> "Enmund *did not kill or intend to kill* and thus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who killed the Kerseys. This was impermissible under the Eighth Amendment." *Ibid.* (emphasis added).

*Enmund* obviously cast considerable doubt on the constitutionality of the death sentences imposed on petitioners in this case. Following the *Enmund* decision, petitioners applied to the Arizona Supreme Court for postconviction review. They argued that *Enmund* prevented the State from imposing the death sentence because they, like Enmund, were accomplices to a felony in which killings occurred that they neither committed nor intended to commit. Despite its earlier holding that petitioners had not killed or intended to kill anyone, the Arizona Supreme Court again upheld the Tisons' sentences. First, the court defined intent broadly, adopting a definition that equates "intent to kill" with the foreseeability of harm:

> "Intend *[sic]* to kill includes the situation in which the defendant intended, contemplated, or anticipated that lethal force would or might be used or that life would or might be taken in accomplishing the underlying felony." 142 Ariz. 454, 456, 690 P. 2d 755, 757 (1984).

The court then reviewed, in a passage this Court quotes at length, *ante*, at 144–145, petitioners' conduct during the

escape and subsequent flight. The court did not attempt to link any of petitioners' statements or actions to the decision to kill the family, nor did it make any findings concerning petitioners' mental states at the time of the shootings. Instead, the court found that each petitioner "could [have] anticipate[d] the use of lethal force during this attempt to flee confinement." 142 Ariz. 446, 448, 690 P. 2d 747, 749 (1984); 142 Ariz., at 456, 690 P. 2d, at 757. The Arizona Supreme Court then held, by a vote of 3–2, that this finding was sufficient to establish that petitioners "intended" (within the meaning of *Enmund*) to kill the Lyons family, and affirmed the death sentences.

The Arizona Supreme Court thus attempted to comply with *Enmund* by making a finding as to petitioners' mental state. The foreseeability standard that the court applied was erroneous, however, because "the possibility of bloodshed is inherent in the commission of any violent felony and this possibility is generally foreseeable and foreseen." *Ante,* at 151. Under the lower court's standard, any participant in a violent felony during which a killing occurred, including Enmund, would be liable for the death penalty. This Court therefore properly rejects today the lower court's misguided attempt to preserve its earlier judgment by equating intent with foreseeable harm. *Ante,* at 150–151. In my view, this rejection completes the analytic work necessary to decide this case, and on this basis petitioners' sentences should have been vacated and the judgment reversed.

The Court has chosen instead to announce a new substantive standard for capital liability: a defendant's "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Ante,* at 158. The Court then remands the case for a determination by the state court whether petitioners are culpable under this new standard. Nevertheless, the Court observes, in dictum, that "the record would support a finding of the culpable mental state of

reckless indifference to human life." *Ante*, at 151; see also *ante*, at 152. ("These facts . . . would clearly support a finding that [both sons] subjectively appreciated that their acts were likely to result in the taking of innocent life").

I join no part of this. First, the Court's dictum that its new category of *mens rea* is applicable to these petitioners is not supported by the record. Second, even assuming petitioners may be so categorized, objective evidence and this Court's Eighth Amendment jurisprudence demonstrate that the death penalty is disproportionate punishment for this category of defendants. Finally, the fact that the Court reaches a different conclusion is illustrative of the profound problems that continue to plague capital sentencing.

## II

The facts on which the Court relies are not sufficient, in my view, to support the Court's conclusion that petitioners acted with reckless disregard for human life.[4] But even if they

---

[4] Petitioners' presence at the scene of the murders, and their participation in flagging down the vehicle, and robbing and guarding the family, indicate nothing whatsoever about their subjective appreciation that their father and his friend would suddenly decide to kill the family. Each of petitioners' actions was perfectly consistent with, and indeed necessary to, the felony of stealing a car in order to continue the flight from prison. Nothing in the record suggests that any of their actions were inconsistent with that aim. Indeed, the trial court recognized the disjunction between the felonies and the murders when it found that Gary Tison's and Greenawalt's decision to murder the family was senseless and unnecessary to the escape. The court based its finding of aggravating circumstances in part "on the senselessness of the murders," and stated that:

"It was not essential to the defendants' continuing evasion of arrest that these persons were murdered. The victims could easily have been restrained sufficiently to permit the defendants to travel a long distance before the robberies, the kidnappings, and the theft were reported." App. 283.

Thus the Court's findings about petitioners' mental states regarding the murders are based solely on inferences from petitioners' participation in the underlying felonies. Their decision to provide arms for and participate

were, the Court's decision to restrict its vision to the limited set of facts that "the Arizona Supreme Court has given . . . to us," *ante*, at 151, is improper.[5] By limiting itself to the facts the lower court found relevant to the foreseeability standard, this Court insulates itself from other evidence in the record directly relevant to the new standard articulated today. This evidence suggests that the question of petitioners' mental states with respect to the shootings is very much an open one to be decided only after a thorough evidentiary hearing. I therefore stress that nothing in the Court's opinion abrogates the State's responsibility independently and fairly to consider all the relevant evidence before applying the Court's new standard. See *Cabana* v. *Bullock*, 474 U. S. 376, 391 (1986) ("Considerations of federalism and comity counsel respect for the ability of state courts to carry out their role as the primary protectors of the rights of criminal defendants").

The evidence in the record overlooked today regarding petitioners' mental states with respect to the shootings is not trivial. For example, while the Court has found that petitioners made no effort prior to the shooting to assist the victims, the uncontradicted statements of both petitioners are

_____

in a prison breakout and escape may support the lower court's finding that they should have anticipated that lethal force might be used during the breakout and subsequent flight, but it does not support the Court's conclusions about petitioners' mental states concerning the shootings that actually occurred.

[5] When the Arizona Supreme Court first reviewed this case on appeal, it stated that petitioners' degree of *mens rea* was of little significance to the case. On rehearing, the Arizona Supreme Court did make a finding that petitioners could have anticipated that lethal force would be used during the breakout or subsequent flight. In that regard, it referred to facts concerning the breakout and escape. See *ante*, at 143–145. The court did not refer to the evidence in the record of petitioners' mental states concerning the *actual shootings*, however, nor was such evidence relevant to its decision. Given the question it had chosen to address, evidence regarding petitioners' actual mental states with regard to the shooting was superfluous.

that just prior to the shootings they were attempting to find a jug of water to give to the family. App. 20–21, 39–41, 74–75, 109. While the Court states that petitioners were on the scene during the shooting and that they watched it occur, Raymond stated that he and Ricky were still engaged in repacking the Mazda after finding the water jug when the shootings occurred. *Id.*, at 21, 75. Ricky stated that they had returned with the water, but were still some distance ("farther than this room") from the Lincoln when the shootings started, *id.*, at 40–41, 111, and that the brothers then turned away from the scene and went back to the Mazda, *id.*, at 113. Neither stated that they anticipated that the shootings would occur, or that they could have done anything to prevent them or to help the victims afterward.[6] Both, however, expressed feelings of surprise, helplessness, and regret. This statement of Raymond's is illustrative:

> "Well, I just think you should know when we first came into this we had an agreement with my dad that nobody would get hurt because we [the brothers] wanted no one hurt. And when this [killing of the kidnap victims] came about we were not expecting it. And it took us by surprise as much as it took the family [the victims] by surprise because we were not expecting this to happen. And I feel bad about it happening. I wish we could [have done] something to stop it, but by the time it happened it was too late to stop it. And it's just something

---

[6] In addition, the Court's statement that Raymond did not act to assist the victims "after" the shooting, and its statement that Ricky "watched the killing after which he chose to aid those whom he had placed in the position to kill rather than their victims," *ante*, at 152, takes license with the facts found by the Arizona Supreme Court. That court did not say whether petitioners did anything to help the victims following the shooting, nor did it make any findings that would lead one to believe that something could have been done to assist them. The lower court merely stated that petitioners did not "disassociate" themselves from their father and Greenawalt after the shooting. *Ante*, at 145 (citation omitted).

we are going to live with the rest of our lives. It will always be there." 142 Ariz., at 462, 690 P. 2d, at 763; see also App. 242.[7]

---

[7] These expressions are consistent with other evidence about the sons' mental states that this Court, like the lower courts, has neglected. Neither son had a prior felony record. App. 233–234. Both lived at home with their mother, and visited their father, whom they believed to be "a model prisoner," each week. See Brief for Petitioners 3 (citing Tr. of Mar. 14, 1979, hearing). They did not plan the breakout or escape; rather their father, after thinking about it himself for a year, mentioned the idea to Raymond for the first time one week before the breakout, and discussed with his sons the possibility of having them participate only the day before the breakout. App. 50–51, 91. The sons conditioned their participation on their father's promise that no one would get hurt; during the breakout, their father kept his word. The trial court found that the murders their father later committed were senseless and unnecessary to the felony of stealing a car in which the sons participated; and just prior to the shootings the sons were retrieving a water jug for the family. Given these circumstances, the sons' own testimony that they were surprised by the killings, and did not expect them to occur, appears more plausible than the Court's speculation that they "subjectively appreciated that their activities were likely to result in the taking of innocent life." *Ante*, at 152. The report of the psychologist, who examined both sons, also suggests that they may not have appreciated the consequences of their participation:

"These most unfortunate youngsters were born into an extremely pathological family and were exposed to one of the premier sociopaths of recent Arizona history. In my opinion this very fact had a severe influence upon the personality structure of these youngsters . . . .

.          .          .          .          .

"I do believe that their father, Gary Tison, exerted a strong, consistent, destructive but subtle pressure upon these youngsters and I believe that these young men got committed to an act which was essentially 'over their heads.' Once committed, it was too late and there does not appear to be any true defense based on brainwashing, mental deficiency, mental illness or irresistable urge. There was a family obsession, the boys were 'trained' to think of their father as an innocent person being victimized in the state prison but both youngsters have made perfectly clear that they were functioning of their own volition. At a deeper psychological level it may have been less of their own volition than as a result of Mr. Tison's 'conditioning' and the rather amoral attitudes within the family home." Brief for Petitioners 11–12, n. 16.

In light of this evidence, it is not surprising that the Arizona Supreme Court rested its judgment on the narrow ground that petitioners could have anticipated that lethal force might be used during the escape, or that the state probation officer—who reviewed at length all the facts concerning the sons' mental states—did not recommend that the death sentence be imposed. The discrepancy between those aspects of the record on which the Court has chosen to focus and those aspects it has chosen to ignore underscores the point that a reliable and individualized *Enmund* determination can be made only by the trial court following an evidentiary hearing. See *Cabana* v. *Bullock*, 474 U. S., at 397–407 (BLACKMUN, J., dissenting); *id.*, at 407–408 (STEVENS, J., dissenting).

## III

Notwithstanding the Court's unwarranted observations on the applicability of its new standard to this case, the basic flaw in today's decision is the Court's failure to conduct the sort of proportionality analysis that the Constitution and past cases require. Creation of a new category of culpability is not enough to distinguish this case from *Enmund*. The Court must also establish that death is a proportionate punishment for individuals in this category. In other words, the Court must demonstrate that major participation in a felony with a state of mind of reckless indifference to human life deserves the same punishment as intending to commit a murder or actually committing a murder. The Court does not attempt to conduct a proportionality review of the kind performed in past cases raising a proportionality question, *e. g.*, *Solem* v. *Helm*, 463 U. S. 277 (1983); *Enmund* v. *Florida*, 458 U. S. 782 (1982); *Coker* v. *Georgia*, 433 U. S. 584 (1977), but instead offers two reasons in support of its view.

## A

One reason the Court offers for its conclusion that death is proportionate punishment for persons falling within its new

category is that limiting the death penalty to those who intend to kill "is a highly unsatisfactory means of definitively distinguishing the most culpable and dangerous of murderers." *Ante*, at 157. To illustrate that intention cannot be dispositive, the Court offers as examples "the person *who tortures* another not caring whether the victim lives or dies, or the robber *who shoots* someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property." *Ibid.* (emphasis added). Influential commentators and some States have approved the use of the death penalty for persons, like those given in the Court's examples, *who kill* others in circumstances manifesting an extreme indifference to the value of human life.[8] Thus an exception to the requirement that only intentional murders be punished with death might be made for persons who actually commit an act of homicide; *Enmund*, by distinguishing from the accomplice case "those who kill," clearly reserved that question. But the constitutionality of the death penalty for those individuals is no more relevant to this case than it was to *Enmund*, because this case, like *Enmund*, involves accomplices *who did not kill*. Thus, although some of the "most culpable and dangerous of murderers" may be those who killed without specifically intending to kill, it is considerably more difficult to apply that rubric con-

---

[8] For example, the Court quotes Professor Fletcher's observation that "the Model Penal Code treats reckless *killing* . . . as equivalent to purposeful and knowing killing." *Ante*, at 157 (emphasis added). The Model Penal Code advocates replacing the felony-murder rule with a rule that allows a conviction for murder only when the killer acted with intent, purpose, or "reckless[ness] under circumstances manifesting extreme indifference to the value of human life." See ALI, Model Penal Code Commentaries § 210.2, p. 13 (Off. Draft 1980). The Code offers as examples shooting into a crowd or an automobile, or shooting a person in the course of playing Russian roulette. *Id.*, at 22–23.

vincingly to those who not only did not intend to kill, but who also have not killed.[9]

It is precisely in this context — where the defendant has not killed — that a finding that he or she nevertheless intended to kill seems indispensable to establishing capital culpability. It is important first to note that such a defendant has not committed an *act* for which he or she could be sentenced to death. The applicability of the death penalty therefore turns entirely on the defendant's mental state with regard to an act committed by another. Factors such as the defendant's major participation in the events surrounding the killing or the defendant's presence at the scene are relevant insofar as they illuminate the defendant's mental state with regard to the killings. They cannot serve, however, as independent grounds for imposing the death penalty.

Second, when evaluating such a defendant's mental state, a determination that the defendant acted with intent is qualitatively different from a determination that the defendant acted with reckless indifference to human life. The difference lies in the nature of the choice each has made. The reckless actor has not *chosen* to bring about the killing in the way the intentional actor has. The person who chooses to

---

[9] A second problem with the Court's examples is that they illustrate wanton, but nevertheless intentional, killings, rather than unintentional killings. The element that these wanton killings lack is not intent, but rather premeditation and deliberation. Professor Fletcher explains the point:

"[W]hile planning and calculation represent one form of heinous or cold-blooded murder, premeditation is not the only feature that makes *intentional* killings wicked. Wanton killings are generally regarded as among the most wicked, and the feature that makes a killing wanton is precisely the absence of detached reflection before the deed. Fitzjames Stephen put the case of a man who 'sees a boy sitting on a bridge over a deep river and, out of mere wanton barbarity, pushes him into it and so drowns him.' Killing without a motive can usually be just as wicked as killing after detached reflection about one's goals." G. Fletcher, Rethinking Criminal Law 254 (1978) (footnote omitted; emphasis added).

act recklessly and is indifferent to the possibility of fatal consequences often deserves serious punishment. But because that person has not chosen to kill, his or her moral and criminal culpability is of a different degree than that of one who killed or intended to kill.

The importance of distinguishing between these different choices is rooted in our belief in the "freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." *Morissette* v. *United States,* 342 U. S. 246, 250 (1952). To be faithful to this belief, which is "universal and persistent in mature systems of law," *ibid.,* the criminal law must ensure that the punishment an individual receives conforms to the choices that individual has made.[10] Differential punishment of reckless and intentional actions is therefore essential if we are to retain "the relation between criminal liability and moral culpability" on which criminal justice depends. *People* v. *Washington,* 62 Cal. 2d 777, 783, 402 P. 2d 130, 134 (1965) (opinion of Traynor, C. J.). The State's ultimate sanction—if it is ever to be used—must be reserved for those whose culpability is greatest. Cf. *Enmund,* 458 U. S., at 798 ("It is fundamental that 'causing harm intentionally must be punished more severely than causing the same harm unintentionally'" (citation omitted)); *United States* v. *United States Gypsum Co.,* 438 U. S. 422, 444 (1978).

Distinguishing intentional from reckless action in assessing culpability is particularly important in felony-murder cases. JUSTICE WHITE stressed the importance of this distinction in *Lockett* v. *Ohio,* 438 U. S. 586 (1978), a felony-murder case in

---

[10] We show this fidelity, for example, when we decline to hold a young child as morally and criminally responsible for an illegal act as we would hold an adult who committed the same act. Although the child has committed the illegal act and caused the harmful result, the child's actions are presumed not to reflect a mature capacity for choice, and the child's culpability for the act is accordingly reduced.

which the petitioner's death sentence was vacated on other grounds.

> "[S]ociety has made a judgment, which has deep roots in the history of the criminal law . . . distinguishing at least for purpose of the imposition of the death penalty between the culpability of those who acted with and those who acted without a purpose to destroy life.

> .            .            .            .            .

> "[T]he type of conduct which Ohio would punish by death requires at most the degree of *mens rea* defined by the ALI Model Penal Code (1962) as *recklessness:* conduct undertaken with knowledge that death is likely to follow. Since I would hold that death may not be inflicted for killings consistent with the Eighth Amendment without a finding that the defendant engaged in conduct with *the conscious purpose of producing death,* these sentences must be set aside." *Id.,* at 626–628 (emphasis added; footnotes omitted).

In *Enmund,* the Court explained at length the reasons a finding of intent is a necessary prerequisite to the imposition of the death penalty. In any given case, the Court said, the death penalty must "measurably contribut[e]" to one or both of the two "social purposes"—deterrence and retribution— which this Court has accepted as justifications for the death penalty. *Enmund, supra,* at 798, citing *Gregg* v. *Georgia,* 428 U. S. 153, 183 (1976). If it does not so contribute, it "'is nothing more than the purposeless and needless imposition of pain and suffering' and hence an unconstitutional punishment." *Enmund, supra,* at 798, quoting *Coker* v. *Georgia,* 433 U. S., at 592. Enmund's lack of intent to commit the murder—rather than the lack of evidence as to his mental state—was the decisive factor in the Court's decision that the death penalty served neither of the two purposes. With regard to deterrence, the Court was

"quite unconvinced . . . that the threat that the death penalty will be imposed for murder will measurably deter one who does not kill and has no intention or purpose that life will be taken. Instead, it seems likely that 'capital punishment can serve as a deterrent only when murder is the result of premeditation and deliberation' . . . ." *Enmund, supra,* at 798–799.[11]

As for retribution, the Court again found that Enmund's lack of intent, together with the fact that he did not kill the victims, was decisive. "American criminal law has long considered a defendant's intention—and therefore his moral guilt—to be critical to the 'degree of [his] criminal culpability.'" 458 U. S., at 800 (citation omitted). The Court concluded that "[p]utting Enmund to death to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts." *Id.,* at 801. Thus, in *Enmund* the Court established that a finding of an intent to kill was a constitutional prerequisite for the imposition of the death penalty on an accomplice who did not kill. The Court has since reiterated that "*Enmund* . . . imposes a categorical rule: a person who has not in fact killed, attempted to kill, or intended that a killing take place or that lethal force be used may not be sentenced to death." *Ca-*

---

[11] The Court acknowledged that "[i]t would be very different if the likelihood of a killing in the course of a robbery were so substantial that one should share the blame for the killing if he somehow participated in the felony." 458 U. S., at 799. Nevertheless, the Court saw no reason to depart from its conclusion that the death penalty could not be justified as a deterrent in that case, because "competent observers have concluded that there is no basis in experience for the notion that death so frequently occurs in the course of a felony for which killing is not an essential ingredient that the death penalty should be considered as a justifiable deterrent to the felony itself." *Ibid.* The trial court found that the killings in the case were not an essential ingredient of the felony. App. 283, quoted *infra,* at 164, n. 4. Thus the goal of deterrence is no more served in this case than it was in *Enmund.*

*bana* v. *Bullock*, 474 U. S., at 386.   The Court's decision today to approve the death penalty for accomplices who lack this mental state is inconsistent with *Enmund* and with the only justifications this Court has put forth for imposing the death penalty in any case.

## B

The Court's second reason for abandoning the intent requirement is based on its survey of state statutes authorizing the death penalty for felony murder, and on a handful of state cases.[12]   On this basis, the Court concludes that "[o]nly

[12] We should be reluctant to conclude too much from the Court's survey of state decisions, because most jurisdictions would not approve the death penalty in the circumstances here, see n. 13, *infra*, and the Court neglects decisions applying the law of those States.   *E. g., Clark* v. *Louisiana State Penitentiary*, 694 F. 2d 75 (CA5 1982) (under Louisiana law, jury must find specific intent to kill); *People* v. *Garcia*, 36 Cal. 3d 539, 684 P. 2d 826 (1984) (death penalty for felony murder may not be imposed without finding of specific intent to kill), cert. denied, 469 U. S. 1229 (1985).

Moreover, the cases the Court does cite are distinguishable from this case.   In four of the five cases cited as evidence of an "apparent consensus" that intent to kill is not a prerequisite for imposing the death penalty, the court did not specifically find an absence of any act or intent to kill. Moreover, in each of these cases the court at least suggested that the defendants intended to kill, attempted to kill, or participated in the actual killing.   *Clines* v. *State*, 280 Ark. 77, 84, 656 S. W. 2d 684, 687 (1983) ("There was direct evidence from more than one source that appellants had discussed among themselves the necessity of murder if they met resistance" and evidence that victim "was immediately attacked by appellants, sustaining blows to his head and face from the metal chain and a mortal wound to the chest"), cert. denied, 465 U. S. 1051 (1984); *Deputy* v. *State*, 500 A. 2d 581, 599 (Del. 1985) ("Deputy was not solely a participant in the underlying felony, but was instead present during, and involved in, the actual murders"), cert. pending, No. 85–6272; *Ruffin* v. *State*, 420 So. 2d 591, 594 (Fla. 1982) ("Evidence is abundantly clear and sufficient to demonstrate Ruffin's joint participation in the premeditated murder of Karol Hurst"); *Selvage* v. *State*, 680 S. W. 2d 17, 22 (Tex. Cr. App. 1984) ("Unlike Enmund, appellant used lethal force to effectuate a safe escape and attempted to kill Ventura and Roberts as they pursued him and his companion from the jewelry store").   As for the fifth case, *People* v. *Davis*, 95 Ill. 2d 1, 52–53, 447 N. E. 2d 353, 378–379 (1983) (defendant received death

a small minority *of those jurisdictions imposing capital punishment for felony murder* have rejected the possibility of a capital sentence absent an intent to kill, and we do not find this minority position constitutionally required." *Ante*, at 158 (emphasis added). The Court would thus have us believe that "the majority of American jurisdictions clearly authorize capital punishment" in cases such as this. *Ante*, at 155. This is not the case. First, the Court excludes from its survey those jurisdictions that have abolished the death penalty and those that have authorized it only in circumstances different from those presented here. When these jurisdictions are included, and are considered with those jurisdictions that require a finding of intent to kill in order to impose the death sentence for felony murder, one discovers that approximately three-fifths of American jurisdictions do not authorize the death penalty for a nontriggerman absent a finding that he intended to kill. Thus, contrary to the Court's implication that its view is consonant with that of "the majority of American jurisdictions," *ibid.*, the Court's view is itself distinctly the minority position.[13]

---

sentence for his role in successive burglaries during each of which codefendant killed resident), the court appears to have held that the defendant "knew" that his codefendant would commit the murder, a mental state significantly different than that attributed to the Tisons.

[13] Thirteen States and the District of Columbia have abolished the death penalty. NAACP Legal Defense and Educational Fund, Death Row U. S. A. 1 (Aug. 1986). According to the Court, *ante*, at 154–156, n. 10, 11 States would not authorize the death penalty in the circumstances presented here. At least four other States not cataloged by the Court also restrict the imposition of capital punishment to those who actually commit and intend to commit murder, and two more States reject the death penalty for most felony murders, see this note *infra*, at 176. In addition, the Supreme Court of at least one of the States cited by the majority as a State authorizing the death penalty absent a finding of intent has explicitly ruled that juries must find that a felony-murder defendant had a specific intent to kill before imposing the death sentence. *Carlos* v. *Superior Court of Los Angeles Co.*, 35 Cal. 3d 131, 672 P. 2d 862 (1983). Thus it appears that

Second, it is critical to examine not simply those jurisdictions that authorize the death penalty in a given circumstance, but those that actually *impose* it. Evidence that a penalty is imposed only infrequently suggests not only that jurisdictions are reluctant to apply it but also that, when it is applied, its imposition is arbitrary and therefore unconstitutional. *Furman* v. *Georgia*, 408 U. S. 238 (1972). Thus, the Court in *Enmund* examined the relevant statistics on the imposition of the death penalty for accomplices in a felony murder. The Court found that of all executions between 1954 and 1982, there were *"only 6 cases out of 362 where a nontriggerman felony murderer was executed. All six executions took place in 1955."* 458 U. S., at 794 (emphasis added). This evidence obviously militates against imposing the death penalty on petitioners as powerfully as it did against imposing it on Enmund.[14]

about three-fifths of the States and the District of Columbia have rejected the position the Court adopts today.

For States that restrict the imposition of capital punishment to those who actually and intentionally kill, see Mo. Rev. Stat. §§ 565.001, 565.003, 565.020 (1986) (death penalty reserved for those who intentionally, knowingly, and deliberately cause death); 18 Pa. Cons. Stat. §§ 2502(a), (b), (d), 1102 (1982) (death penalty reserved for those who commit an intentional killing); Vt. Stat. Ann., Tit. 13, §§ 2303(b), (c) (Supp. 1986) (only murderers of correctional officers subject to death penalty); Wash. Rev. Code §§ 9A.32.030, 10.95.020 (1985) (death penalty reserved for those who commit premeditated killing with at least one aggravating circumstance). Two other States also forbid imposition of the death penalty under the general standards announced today, although other aspects of their statutes might render them applicable to these defendants on the facts of this case. See Md. Ann. Code, Art. 27, §§ 410, 412(b), 413(d)(10), 413(e)(1), 413(d)(5) (1957 and Supp. 1986) (death penalty may be imposed only on person who committed the killing, but possible exception if victim is a child); N. H. Rev. Stat. Ann. §§ 630:1, 630:1(III), 630:1-a(I)(b)(2) (1986) (death penalty reserved for killing a law enforcement officer, murder for hire, and killing during a kidnaping).

[14] Although the Court ignores the statistics on actual executions, it does refer earlier in its opinion to the evidence discussed in *Enmund* that of the 739 inmates on death row for whom sufficient data were available, only 41

The Court in *Enmund* also looked at the imposition of the death penalty for felony murder within Florida, the State that had sentenced Enmund. Of the 45 murderers then on death row, 36 had been found to have "intended" to take life, and 8 of the 9 for which there was no finding of intent had been the triggerman. Thus in only one case—*Enmund*—had someone (such as the Tisons) who had neither killed nor intended to kill received the death sentence. Finally, the Court noted that in no Commonwealth or European country could Enmund have been executed, since all have either abolished or never employed a felony-murder doctrine. *Id.*, at 796–797, n. 22.[15]

The Court today neither reviews nor updates this evidence. Had it done so, it would have discovered that, even

---

did not participate in the fatal assault on the victim and only 16 were not present. *Ante*, at 148; see *Enmund*, 458 U. S., at 795. While in *Enmund* the Court focused on a breakdown of these statistics into those physically present at the scene and those not, that information is not relevant here. What would be relevant, and what the summary in *Enmund* does not tell us, is how many of the 41 who did not participate were also found not to have intended that the murder occur.

Although statistics on the average sentences given for nontriggermen in felony murders were not presented to the Court, it is possible that such statistics would reveal a wide range of results. One felony-murder case worth noting in this regard is *People* v. *Ganter*, 56 Ill. App. 3d 316, 371 N. E. 2d 1072 (1977). Ganter and a codefendant committed an armed robbery of a store, during which Ganter killed one of the store's owners. "The evidence at trial showed defendant was the actual murderer. He shot Thomas at close range, without provocation and as Thomas stood in a helpless position. The accomplice, although accountable for the death by his participation in the attempt *[sic]* armed robbery, did not do the actual killing." *Id.*, at 328, 371 N. E. 2d, at 1080–1081. Ganter was sentenced to 20–30 years; his accomplice was sentenced to 3–6 years. *Id.*, at 321, 327, 371 N. E. 2d, at 1076, 1080.

[15] Since *Enmund* was decided, the Netherlands and Australia have abolished the death penalty for all offenses, and Cyprus, El Salvador, and Argentina have abolished it for all crimes except those committed in wartime or in violation of military law. Amnesty International, United States of America, The Death Penalty 228–231 (1987).

including the 65 executions since *Enmund,* "[t]he fact remains that we are not aware of a single person convicted of felony murder over the past quarter century who did not kill or attempt to kill, and did not intend the death of the victim, who has been executed . . . ." 458 U. S., at 796.[16] Of the 64 persons on death row in Arizona, all of those who have raised and lost an *Enmund* challenge in the Arizona Supreme Court have been found either to have killed or to have specifically intended to kill.[17] Thus, like Enmund, the Tisons' sentence

---

[16] Lists of those executed and those on death row are published in NAACP Legal Defense Fund, Death Row U. S. A. (Mar. 1987). Review of those executed since 1982 reveals that each person executed was found to have committed a killing and/or to have intended to kill. In only two cases does there remain some doubt whether the person executed actually killed the victim; in each case, however, the defendant was found at a minimum to have intended to kill. *Green* v. *Zant,* 738 F. 2d 1529, 1533–1534 (CA11) (case was presented to jury on malice-murder rather than felony-murder theory, and evidence supported verdict on that theory), cert. denied, 469 U. S. 1098 (1984); *Skillern* v. *Estelle,* 720 F. 2d 839, 844 (CA5 1983) (evidence supports finding that Skillern agreed and "plotted in advance" to kill the eventual victim), cert. denied *sub nom. Skillern* v. *Procunier,* 469 U. S. 1067 (1984).

[17] See Amnesty International, *supra,* at 192 (listing death row totals by State as of Oct. 1986). The cases since *Enmund* in which the Arizona Supreme Court has rejected the defendant's *Enmund* challenge and affirmed the death sentence are: *State* v. *Correll,* 148 Ariz. 468, 478, 715 P. 2d 721, 731 (1986) (defendant intended to kill victims and "verbally encouraged" codefendant to proceed with killing); *State* v. *Martinez-Villareal,* 145 Ariz. 441, 702 P. 2d 670 (defendant actively took part in the murder and intended to kill), cert. denied, 474 U. S. 975 (1985); *State* v. *Hooper,* 145 Ariz. 538, 703 P. 2d 482 (1985) (defendant killed for hire), cert. denied, 474 U. S. 1073 (1986); *State* v. *Bishop,* 144 Ariz. 521, 698 P. 2d 1240 (1985) (defendant planned and intended to kill, assaulted victim, and abandoned victim in mine shaft); *State* v. *Poland,* 144 Ariz. 388, 698 P. 2d 183 (1985) (defendants killed victims), aff'd, 476 U. S. 147 (1986); *State* v. *Villafuerte,* 142 Ariz. 323, 690 P. 2d 42 (1984) (defendant killed victim), cert. denied, 469 U. S. 1230 (1985); *State* v. *Fisher,* 141 Ariz. 227, 686 P. 2d 750 (defendant killed victim), cert. denied, 469 U. S. 1066 (1984); *State* v. *James,* 141 Ariz. 141, 685 P. 2d 1293 (defendant killed and intended to kill), cert. denied, 469 U. S. 990 (1984); *State* v. *Harding,* 141 Ariz. 492, 687 P. 2d 1247

appears to be an aberration within Arizona itself as well as nationally and internationally. The Court's objective evidence that the statutes of roughly 20 States appear to authorize the death penalty for defendants in the Court's new category is therefore an inadequate substitute for a proper proportionality analysis, and is not persuasive evidence that the punishment that was unconstitutional for Enmund is constitutional for the Tisons.

## C

The Court's failure to examine the full range of relevant evidence is troubling not simply because of what that examination would have revealed, but because until today such an examination has been treated as constitutionally required *whenever* the Court undertakes to determine whether a given punishment is disproportionate to the severity of a given crime. *Enmund* is only one of a series of cases that have framed the proportionality inquiry in this way. See, *e. g.*, *Coker* v. *Georgia*, 433 U. S. 584 (1977). In the most recent such case, *Solem* v. *Helm*, 463 U. S. 277, 292 (1983), the Court summarized the essence of the inquiry:

"In sum, a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences *imposed* on other criminals in the same jurisdiction; and (iii) the sentences

---

(1984) (defendant killed victim); *State* v. *Libberton*, 141 Ariz. 132, 685 P. 2d 1284 (1984) (defendant killed victim); *State* v. *Jordan*, 137 Ariz. 504, 672 P. 2d 169 (1983) (defendant killed and intended to kill); *State* v. *Smith*, 138 Ariz. 79, 673 P. 2d 17 (1983) (defendant killed and intended to kill), cert. denied, 465 U. S. 1074 (1984); *State* v. *Richmond*, 136 Ariz. 312, 666 P. 2d 57 (defendant intended to kill, participated in assault that led to death), cert. denied, 464 U. S. 986 (1983); *State* v. *McDaniel*, 136 Ariz. 188, 665 P. 2d 70 (1983) (defendant killed victim); *State* v. *Gillies*, 135 Ariz. 500, 662 P. 2d 1007 (1983) (defendant took an active and deliberate part in the killing). Although the Court suggests otherwise, *ante*, at 155–156, n. 11, in none of these cases does the Arizona Supreme Court's finding of intent appear to rest, as it did here, on a finding that a killing was merely foreseeable.

*imposed* for commission of the same crime in other jurisdictions." (Emphasis added.)

By addressing at best only the first of these criteria, the Court has ignored most of the guidance this Court has developed for evaluating the proportionality of punishment.

Such guidance is essential in determining the constitutional limits on the State's power to punish. These limits must be defined with care, not simply because the death penalty is involved, but because the social purposes that the Court has said justify the death penalty—retribution and deterrence—are justifications that possess inadequate self-limiting principles. As Professor Packer observed, under a theory of deterrence the state may justify such punishments as "boiling people in oil; a slow and painful death may be thought more of a deterrent to crime than a quick and painless one." Packer, Making the Punishment Fit the Crime, 77 Harv. L. Rev. 1071, 1076 (1964).[18] Retribution, which has as its core logic

---

[18] The utilitarian logic of deterrence can also justify unjust punishments that are more commonly dispensed. See Fletcher, Rethinking Criminal Law, at 415 ("Judges in traffic courts are readily tempted by the philosophy that regardless of whether the particular suspect has committed the violation, a punitive fine will make him drive more carefully in the future").

A sophisticated utilitarian theory of deterrence might propose some limiting principles, *e. g.*, "no punishment must cause more misery than the offense unchecked." H. Hart, Punishment and Responsibility 76 (1968). But as Hart points out, this and other principles "do not seem to account for the character of the normal unwillingness to 'punish' those who have not broken the law at all, nor for the moral objection to strict liability which permits the punishment of those who act without *mens rea*." *Ibid.* In Hart's view, "civilized moral thought" would limit the utilitarian theories of punishment "by the demand that punishment should not be applied to the innocent," and by limiting "punishments in order to maintain a scale for different offenses which reflects, albeit very roughly, the distinction felt between the moral gravity of these offenses. Thus we make some approximation to the ideal of justice of treating morally like cases alike and morally different ones differently." *Id.*, at 80. It is worth noting that both of the limits Hart identifies have been given vitality in the Court's proportionality jurisprudence. *E. g.*, *Robinson* v. *California*, 370 U. S.

the crude proportionality of "an eye for an eye," has been regarded as a constitutionally valid basis for punishment only when the punishment is consistent with an "individualized consideration" of the defendant's culpability, *Lockett* v. *Ohio*, 438 U. S., at 605, and when "the administration of criminal justice" works to "channe[l]" society's "instinct for retribution." *Furman* v. *Georgia*, 408 U. S., at 308 (Stewart, J., concurring). Without such channeling, a State could impose a judgment of execution by torture as appropriate retribution for murder by torture.[19] Thus, under a simple theory either of deterrence or retribution, unfettered by the Constitution, results disturbing to civil sensibilities and inconsistent with "the evolving standards of decency" in our society become rationally defensible. Cf. *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958).

The Framers provided in the Eighth Amendment the limiting principles otherwise absent in the prevailing theories of punishment. One such principle is that the States may not impose punishment that is disproportionate to the severity of

---

660, 667 (1962) ("Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold"); *Enmund* v. *Florida*, 458 U. S., at 801 (Enmund's "punishment must be tailored to his personal responsibility and moral guilt").

[19] Such punishment might also be defended on the utilitarian ground that it was necessary to satisfy the community's thirst for retribution and thereby keep the peace. Such grounds can be used to justify the punishment even of innocent people when the guilty have not been found and the mob threatens new violence. It is thus clear that "channeling" retributive instincts requires the State to do more than simply replicate the punishment that private vengeance would exact. To do less is simply to socialize vigilantism. As JUSTICE MARSHALL has stated: "[T]he Eighth Amendment is our insulation from our baser selves. The 'cruel and unusual' language limits the avenues through which vengeance can be channeled. Were this not so, the language would be empty and a return to the rack and other tortures would be possible in a given case." *Furman* v. *Georgia*, 408 U. S. 238, 345 (1972) (concurring opinion). See also *Gregg* v. *Georgia*, 428 U. S. 153, 237–241 (1976) (MARSHALL, J., dissenting) (death penalty unnecessary to further legitimate retributive goals).

the offense or to the individual's own conduct and culpability. Because the proportionality inquiry in this case overlooked evidence and considerations essential to such an inquiry, it is not surprising that the result appears incongruous. Ricky and Raymond Tison are similarly situated with Earl Enmund in every respect that mattered to the decision in *Enmund.* Like Enmund, the Tisons neither killed nor attempted or intended to kill anyone. Like Enmund, the Tisons have been sentenced to death for the intentional acts of others which the Tisons did not expect, which were not essential to the felony, and over which they had no control. Unlike Enmund, however, the Tisons will be the first individuals in over 30 years to be executed for such behavior.

I conclude that the proportionality analysis and result in this case cannot be reconciled with the analyses and results of previous cases. On this ground alone, I would dissent. But the fact that this Court's death penalty jurisprudence can validate different results in analytically indistinguishable cases suggests that something more profoundly disturbing than faithlessness to precedent is at work in capital sentencing.

## IV

In 1922, "five negroes who were convicted of murder in the first degree and sentenced to death by the Court of the State of Arkansas" appealed to this Court from an order of the District Court dismissing their writ of habeas corpus. *Moore* v. *Dempsey,* 261 U. S. 86, 87 (1923). The crux of their appeal was that they "were hurried to conviction under the pressure of a mob without any regard for their rights and without according to them due process of law." *Ibid.* In reversing the order, Justice Holmes stated the following for the Court:

> "It certainly is true that mere mistakes of law in the course of a trial are not to be corrected [by habeas corpus]. But if the case is that the whole proceeding is a mask—that counsel, jury, and judge were swept to the fatal end by an irresistible wave of public passion, and

that the State Courts failed to correct the wrong, neither perfection in the machinery for correction nor the possibility that the trial court and counsel saw no other way of avoiding an immediate outbreak of the mob can prevent this Court from securing to the petitioners their constitutional rights." *Id.*, at 91.

## A

In *Furman* v. *Georgia, supra,* this Court concluded that the State's procedural machinery was so imperfect that imposition of the death penalty had become arbitrary and therefore unconstitutional. A scant four years later, however, the Court validated Georgia's new machinery, and in 1977 executions resumed. In this case, the State appears to have afforded petitioners all of the procedures that this Court has deemed sufficient to produce constitutional sentencing decisions. Yet in this case, as in *Moore,* "perfection in the [State's] machinery for correction" has not secured to petitioners their constitutional rights. So rarely does any State (let alone any Western country other than our own) ever execute a person who neither killed nor intended to kill that "these death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual." *Furman* v. *Georgia, supra,* at 309 (Stewart, J., concurring). This case thus demonstrates, as *Furman* also did, that we have yet to achieve a system capable of "distinguishing the few cases in which the [death penalty] is imposed from the many cases in which it is not." 408 U. S., at 313 (WHITE, J., concurring).

What makes this a difficult case is the challenge of giving substantive content to the concept of criminal culpability. Our Constitution demands that the sentencing decision itself, and not merely the procedures that produce it, respond to the reasonable goals of punishment. But the decision to execute these petitioners, like the state courts' decisions in *Moore,* and like other decisions to kill, appears responsive

less to reason than to other, more visceral, demands. The urge to employ the felony-murder doctrine against accomplices is undoubtedly strong when the killings stir public passion and the actual murderer is beyond human grasp. And an intuition that sons and daughters must sometimes be punished for the sins of the father may be deeply rooted in our consciousness.[20] Yet punishment that conforms more closely to such retributive instincts than to the Eighth Amendment is tragically anachronistic in a society governed by our Constitution.

## B

This case thus illustrates the enduring truth of Justice Harlan's observation that the tasks of identifying "those characteristics of criminal homicides and their perpetrators which call for the death penalty, and [of] express[ing] these characteristics in language which can be *fairly* understood and applied by the sentencing authority appear to be . . . beyond present human ability." *McGautha* v. *California*, 402 U. S. 183, 204 (1971) (emphasis added). The persistence of doctrines (such as felony murder) that allow excessive discretion in apportioning criminal culpability and of decisions (such as today's) that do not even attempt "precisely [to] delineate the particular types of conduct and states of mind warranting imposition of the death penalty," *ante*, at 158, demonstrates that this Court has still not articulated rules that will ensure that capital sentencing decisions conform to the substantive principles of the Eighth Amendment. Arbitrariness continues so to infect both the procedure and substance of capital sentencing that any decision to impose the

---

[20] The prophets warned Israel that theirs was "a jealous God, visiting the iniquity of the fathers upon the children unto the third and fourth generation of them that hate [Him]." Exodus, 20:5 (King James version). See, *e. g.*, Horace, Odes III, 6:1 (C. Bennett trans. 1939) ("Thy fathers' sins, O Roman, thou, though guiltless, shall expiate"); W. Shakespeare, The Merchant of Venice, Act III, scene 5, line 1 ("Yes, truly, for look you, the sins of the father are to be laid upon the children"); H. Ibsen, Ghosts (1881).

death penalty remains cruel and unusual. For this reason, as well as for the reasons expressed in *Gregg* v. *Georgia*, 428 U. S., at 227, I adhere to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, and dissent.