Gregory **RESNOVER**, Plaintiff–
Appellant,

v.

Linley E. **PEARSON**, Attorney General of
Indiana, and Richard Clark, Superin-
tendent, Indiana State Prison, Defen-
dants–Appellees.

No. 91–1367.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 18, 1991.

Decided June 25, 1992.

Charles A. Asher, South Bend, Ind., Kevin P. McGoff (argued), Safrin, Kiefer & McGoff, Brent Westerfeld, Indianapolis, Ind., for plaintiff-appellant.

David A. Arthur, Deputy Atty. Gen., Office of Atty. Gen., Federal Litigation, Indianapolis, Ind., for defendants-appellees.

Before BAUER, Chief Judge, POSNER and FLAUM, Circuit Judges.

BAUER, Chief Judge.

At approximately 5:30 a.m. on December 11, 1980, Sergeant Jack Ohrberg of the Indianapolis Police was gunned down as he attempted to serve arrest warrants on certain individuals believed to reside at 3544 North Oxford Street in Indianapolis. Plaintiff-appellant Gregory Resnover and his co-defendant at trial, Tommie Smith, have been sentenced to die in the electric chair as a result of Ohrberg's murder. Resnover now stands before this court and requests relief from his conviction and sentence. We decline. Instead, we affirm the district court's denial of habeas corpus.

## I.

In *Resnover v. State*, 460 N.E.2d 922, 926 (Ind.), *cert. denied*, 469 U.S. 873, 105 S.Ct. 231, 83 L.Ed.2d 160 (1984), the Supreme Court of Indiana determined the relevant facts: at approximately 3:00 a.m. on December 11, 1980, Indianapolis police Sergeant Jack Ohrberg met Sergeant Lewis J. Christ to serve papers on individuals currently residing in Indianapolis. Other officers subsequently joined Sergeants Ohrberg and Christ before they arrived at the duplex residence at 3544 North Oxford Street at approximately 5:30 a.m. With Officers Schneider and Harvey standing watch in the rear, Ohrberg, Christ, and Officers Ferguson and Foreman proceeded across the porch of the residence to the front door. Both Foreman and Ferguson were in uniform.

Ohrberg knocked loudly several times and identified himself as a police officer. He then went to 3546 North Oxford, the other half of the duplex residence, and checked with Sandra Richardson to see if she knew whether anyone currently occupied the 3544 address. Richardson told Ohrberg that she heard noise emanating from that residence. Ohrberg returned to 3544 and again pounded on the front door, announcing himself and the other men as police officers. Ohrberg than assumed a crouched position and started to use his right shoulder to batter the door which, after a few hits, began to open. Ohrberg continued to push the door open as he moved partially inside the doorway. Foreman shined a flashlight over Ohrberg's head and noticed a piece of furniture preventing the door from opening completely. As Foreman looked inside the residence, he saw a sudden burst of muzzle flashes and heard two, possibly three shots in quick succession. These simultaneous muzzle flashes came from two separate locations approximately eight to ten feet apart inside the residence. Immediately Ohrberg said, "Oh no, I've been shot" or "I've been hit." He stepped back two steps, sank to his knees, and collapsed on the porch.

Taking cover, Christ saw a person with an "Afro" type hairstyle emerge from the dark doorway onto the porch and fire at least two additional shots into Sergeant Ohrberg. At the same time, shots were being rapidly fired from within the residence. When Christ returned the gunfire, the man on the porch quickly retreated inside the building. After more shooting, a man identifying himself as "Gregory" called from inside the house and said, "Let's talk." Gregory stated that there was an injured man inside and offered to send out two women who were inside the residence. Christ refused to accept the women and ordered Gregory to leave the residence. Gregory stepped to the door, threw a weapon into the front yard, and

walked onto the porch with his hands raised.

On June 29, 1981, a jury found Gregory Resnover guilty of murder and conspiracy to commit murder. The next day, the jury returned a recommendation that Resnover be executed.[1] The trial court agreed and sentenced Resnover to die in the electric chair. Three years later, in March 1984, the Indiana Supreme Court affirmed the conviction and sentence. *See Resnover v. State*, 460 N.E.2d at 922. Resnover then filed two petitions for post-conviction relief, one in October 1984, the other in March 1988. Both were denied by the Indiana trial court. The Indiana Supreme Court affirmed both trial court rulings. *See Resnover v. State*, 507 N.E.2d 1382 (Ind.), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 762, 98 L.Ed.2d 779 (1988); *Resnover v. State*, 547 N.E.2d 814 (Ind.1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 216, 112 L.Ed.2d 175 (1990).

On May 2, 1988, Resnover filed a petition for writ of habeas corpus, seeking relief under 28 U.S.C. § 2254 ("§ 2254"), in the United States District Court for the Northern District of Indiana. Approximately one month later, Resnover requested an evidentiary hearing, which the district court refused to provide. After hearing oral argument, the district court denied Resnover's habeas petition. *Resnover v. Pearson*, 754 F.Supp. 1374 (N.D.Ind.1991). Resnover appealed. The district court granted a stay of execution until further notice.

## II.

On appeal, Resnover makes ten challenges to his conviction and sentence. We consider each in turn.

■ Resnover first claims that the district court committed reversible error by denying his motion for an evidentiary hearing. Citing the standard annunciated in *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963),[2] Resnover argues that the district court neglected to review the state court record before rejecting his motion. Yet since oral argument, the Supreme Court has overruled *Townsend. See Keeney v. Tamayo–Reyes*, —— U.S. ——, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). In *Keeney*, the Supreme Court held that the cause-and-prejudice standard is the appropriate measure for excusing a habeas petitioner's failure to develop a material fact in state-court proceedings. *See Keeney*, 112 S.Ct. at 1718. As the Court declared, "application of the cause-and-prejudice standard ... will appropriately accommodate concerns of finality, comity, judicial economy, and channeling the resolution of claims into the most appropriate forum." *Id.* at 1719.

■ With *Keeney's* cause-and-prejudice standard, the habeas petitioner is entitled to an evidentiary hearing if he can show cause for his failure to develop the facts in state-court proceedings and actual prejudice resulting from that failure. *Id.* at 1720. The Court permits one narrow ex-

---

1. Thus, the trial was conducted in two parts, the guilt/innocence phase and the penalty phase.

2. *Townsend* provided the following standard: Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding. In other words a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts. FN9 FN9 The existence of the exhaustion of state remedies requirement ... lends support to the view that a federal hearing is not always required. It presupposes that the State's adjudication of the constitutional issue can be of aid to the federal court sitting in habeas corpus.

372 U.S. at 312–13, 83 S.Ct. at 757. *Townsend* listed six circumstances in which a federal court must grant an evidentiary hearing to a habeas applicant:

If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing. *Id.* at 313, 83 S.Ct. at 757. *See also* 28 U.S.C. § 2254(d).

ception to this rule: a habeas petitioner's failure to develop a claim in state-court proceedings will be excused and a hearing mandated if he can show that a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing. *Id.*

■ In its order denying Resnover's request for an evidentiary hearing, the district court, citing the "present massive state record," declared, "This court has reviewed the long laundry list of possible subjects for an evidentiary hearing and concludes that none of same requires such an evidentiary hearing." District Court Order, July 12, 1990, Appellant's Appendix at 52. Finding that Resnover failed to sustain his burden to establish the need for an evidentiary hearing, the district court denied the motion.

We see no error in the district court's ruling. Under either the now obsolete *Townsend* formula or the more restrictive *Keeney* standard, Resnover is unable to demonstrate that a federal evidentiary hearing is warranted. He can only seize upon the fact that the district court did not explicitly determine the non-existence of the six scenarios described in *Townsend*. Resnover also argues that the district court's order does not evince an indication that the court reviewed the record before denying the request for a hearing. Neither of these claims convinces us.

If Resnover could satisfy *Townsend*, then we would be inclined to remand the case to afford him the opportunity to present evidence establishing cause-and-prejudice under *Keeney*. But Resnover cannot overcome the more lenient *Townsend* criteria. *Townsend* and its progeny taught that a hearing is required when the facts were not properly before the district court, or when the process by which those facts were determined somehow was defective. *See U.S. ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1139 (7th Cir.1990) ("In cases where a constitutional right is not blatantly violated, *Townsend* leaves it to the discretion of trial court to determine whether an evidentiary hearing is necessary."); *Matta–Ballesteros v. Henman*, 896 F.2d 255, 258 (7th Cir.) ("[A]n evidentiary hearing is not necessary when the facts essential to consideration of the constitutional issue are already before the court."), *cert. denied*, —— U.S. ——, 111 S.Ct. 209, 112 L.Ed.2d 169 (1990); *U.S. ex rel. Shore v. O'Leary*, 833 F.2d 663, 669 (7th Cir.1987) ("Under the habeas corpus statute, ... the state court determination shall be presumed correct. Thus, we find, in the circumstances of this case, no federal evidentiary hearing is mandated under the principles of *Townsend*."); *Cartee v. Nix*, 803 F.2d 296, 299 (7th Cir.1986) ("[T]he district court did not abuse its discretion in not holding an evidentiary hearing. The state's fact-finding procedures ... provided petitioners a full and fair hearing. None of the circumstances outlined by the *Townsend* Court mandate an evidentiary hearing."), *cert. denied*, 480 U.S. 938, 107 S.Ct. 1584, 94 L.Ed.2d 774 (1987). Having failed in the first instance to demonstrate that the facts were not properly before the district court, Resnover is thus unable to show cause for his failure to develop a material fact and prejudice resulting from that failure.

Put simply, Resnover has had a fair opportunity to present his case—including his claims of ineffective assistance of counsel—in state court proceedings. As we have mentioned, there was a trial, whose result was affirmed by the Supreme Court of Indiana. Resnover then filed two petitions for post-conviction relief. Both petitions were denied by the Indiana trial court and then affirmed by the Indiana Supreme Court. At every stage, the United States Supreme Court refused to grant certiorari. The record of those proceedings, including testimony by deposition, was before the district court. Absent a fundamental miscarriage of justice resulting from the refusal to hold a federal evidentiary hearing, neither the terms of § 2254(d) nor any case law requires such a hearing after there has been a full and fair adjudication in state court. The district court did not err in denying Resnover's motion for federal evidentiary hearing.

Resnover next argues that the district court erred when it held that a number of his claims were procedurally defaulted because they had not been raised in state court. Citing *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), Resnover claims that the district court improperly ruled on both the exhausted and non-exhausted claims of his petition. Resnover does not challenge the district court's conclusion that he had failed to present certain of his habeas claims to the state court. Instead, he criticizes the course of action taken by the court, namely, the finding that several of his claims were procedurally defaulted, foreclosing consideration of those claims in federal court. Resnover argues that the district court should have dismissed the "mixed petition" (i.e. one containing exhausted and non-exhausted claims) without prejudice.

■ Apparently, Resnover confuses the distinction between procedural default and failure to exhaust. Exhaustion refers only to issues that have not been presented to the state court but still may be presented. *Engle v. Isaac*, 456 U.S. 107, 125–26 n. 28, 102 S.Ct. 1558, 1570–71 n. 28, 71 L.Ed.2d 783 (1982) ("Section 2254(b) requires habeas applicants to exhaust those remedies 'available in the courts of the State.' This requirement, however, refers only to remedies still available at the time of the federal petition."). Procedural default, on the other hand, occurs when a claim could have been but was not presented to the state court and cannot, at the time that the federal court reviews the habeas petition, be presented to the state court. Without a showing of "good cause" for the default and prejudice to the petitioner, an issue that could have been, but was not presented to the state court, cannot be addressed in federal habeas corpus proceedings. *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977). *See also Norris v. United States*, 687 F.2d

899, 901 (7th Cir.1982) ("[I]f a petitioner for habeas corpus has not fulfilled procedural requirements under state law for judicial review of an issue, the court may not reach the merits of the issue unless the petitioner shows good cause for his procedural default and prejudice resulting from not being allowed to raise the issue on habeas corpus.").

■ In the instant case, the district court carefully reviewed existing case law governing procedural default and concluded that issues which Resnover had not raised in state court should be procedurally defaulted.[3] *Resnover*, 754 F.Supp. at 1385. The district court essentially based its reasoning on two cases, *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), and *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *Harris* held that "procedural default does not bar our consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a procedural bar." In *Teague*, the Supreme Court declared:

The rule announced in *Harris v. Reed* assumes that a state court has had the opportunity to address a claim that is later raised in a federal habeas proceeding. It is simply inapplicable in a case such as this one where the claim was never presented to the state courts.

489 U.S. at 299, 109 S.Ct. at 1068–69. With this direction, the district court determined that

[I]ssues which were *never* raised in the state courts are the proper subject of procedural default in this collateral review under § 2254. Were it to be otherwise, there could never be an end to this kind of collateral review. If a defendant convicted in a state court proceeding could file continuous assertions of issues and claims not previously raised in the state courts, and then could claim the

---

**3.** One issue in particular involves Resnover's attempt to change theories on appeal. Previously, Resnover claimed ineffective assistance of counsel because his counsel did not adequately support motions filed *pro se*. Now, before us, Resnover contends that he did, in fact, assert

the right to proceed *pro se* and that the district court improperly denied that request. *See* Appellant's Brief at 57. This claim was never presented in state courts or even in the district court; procedural default clearly applies.

benefits of *Harris*, it would be very difficult if not impossible, to ever bring a § 2254 proceeding to an end.

*Resnover*, 754 F.Supp. at 1385.

We agree with the district court's conclusion. There is no question that the issues which the district court deemed procedurally defaulted were not raised in state court. Indeed, Resnover does not argue in this appeal that there are state court remedies available, nor does the State of Indiana concede that any remedies exist. Yet, absent the required showing of cause and prejudice for his failure to present these claims earlier, we must affirm the district court's denial of the claims not presented to the state courts.

Resnover next argues that his rights under the Sixth Amendment were violated when the government used as evidence at trial his statements to a fellow inmate. Gregory Johnson, the inmate who testified, was not a police agent. The Supreme Court of Indiana found that he was not there at the request or suggestion of the government. *Resnover*, 460 N.E.2d at 933. This finding is a historical fact to which we give "a presumption of correctness" under § 2254(d). *Sumner v. Mata*, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981).

■ Johnson testified about a conversation he had with Resnover while together in a courtroom holding cell during the afternoon following Ohrberg's murder. The evidence shows that Johnson approached the jail officers and related to them that he had obtained information about the Ohrberg murder. Johnson wanted to use the information to strike a plea bargain for himself with the prosecutor. There is no allegation that when he talked with Resnover, Johnson had any function as a government agent or that he was encouraged in any way by the government to secure information from Resnover. *See Resnover*, 460 N.E.2d at 933. Without a finding that Johnson acted as a law enforcement officer or at the behest of the government, there was no Sixth Amendment violation. *United States v. Henry*, 447 U.S. 264, 274–75, 100 S.Ct. 2183, 2188–89, 65 L.Ed.2d 115 (1980) (Sixth Amendment is violated when the government deliberately elicits incriminating statements from an indicted prisoner through an undisclosed government agent). The trial court did not err by allowing Johnson's testimony into evidence.

■ Resnover also claims that he was denied effective assistance of counsel. We disagree. The oft-repeated test for whether there is a constitutional violation of the Sixth Amendment was announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Resnover must show that his counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced the defense. *Id.* at 687, 104 S.Ct. at 2064. *Strickland* imposes on any petitioner a presumption that his attorney's conduct falls within the wide range of what is considered reasonable professional assistance.

■ Resnover argues that his counsel failed to represent him effectively at the penalty phase of the trial by neglecting to present to the jury any mitigating evidence. Resnover points to his trial counsel's words to the jury that Resnover "has elected to waive his rights to be present; consequently, I don't have any evidence to offer." *See Resnover*, 507 N.E.2d at 1387. In his briefs and at oral argument, Resnover specifically cites his counsel's failure to present the testimony of his father, Beverly Resnover, as an example of his counsel's deficient performance. Resnover contends, "[Beverly] was readily available to ask the jury to spare the life of his son. If Beverly's plea for mercy reached one of the twelve jurors, the result may have been different." *See* Resnover's Reply Brief at 9.

The district court concluded that Resnover's counsel satisfied the standards of the Sixth Amendment. *See Resnover*, 754 F.Supp. at 1385–86. We agree. As the district court noted, the task of representing any defendant charged with a capital offense is fraught with difficulty; it involves delicate strategic and ethical

choices. *Id.* at 1384. Resnover's counsel sought to distance his client from his code-fendant while presenting his client as contrite, humble, and a victim of circumstance. Resnover refused to cooperate with this reasonable strategy. In fact, he deliberately absented himself from the penalty phase of the trial over the strong protestations of his counsel. *See* Transcript of Proceedings at Trial ("Trial Trans.") at 2364–67. Resnover, who chose not to be present, cannot now argue that his counsel failed him in the penalty phase of the trial by refusing to introduce evidence in mitigation.

■ Counsel's decision not to present the testimony of Resnover's father demonstrates the reasonableness of his strategy and the weakness of Resnover's Sixth Amendment claim. At the first post-conviction hearing, Beverly Resnover indicated that, if he had been called at the penalty phase of the trial, he would have told the jury that "[he] didn't believe in the death penalty or ... that he was my son and I loved him very much and naturally I wouldn't want to see ... his life taken." *See* Transcript of Proceedings, Hearing on Post–Conviction Relief Petition, March 29, 1985 ("Post–Conviction Trans.") at 173. While Beverly Resnover's testimony surely would have evoked sympathy, in the final analysis it could have had a pejorative effect on the jury. It is quite possible that Beverly's testimony could have permitted the government to elicit his son's lengthy criminal history, evidence of which the jury generally was unaware. *See id.* at 174.

But even if Resnover's criminal history were not educed from Beverly on cross-examination, we still see no constitutional deficiency in refusing to present the convicted's father to the jury. Counsel chose to follow a reasonable strategy to plead for his client's life:

> We had a great approach to follow if only we could have followed it. My advice to Gregory was ... to go in and tell the jury that he wasn't the man that killed the detective, that he was sorry that it happened, that it was early in the morning, the police approached the house with a great deal of stealth and suddenly

began knocking down doors trying to get in to make an arrest. He was right out of bed, confused, there was a lot of noise and suddenly gunfire—if he'd explained that to the jury I don't think they would have ever recommended the death penalty.

*Id.* at 39. Resnover is unable to show that this strategy was deficient or that any alleged deficiency prejudiced his defense. In other words, Resnover fails to demonstrate that there is "a reasonable possibility that, but for the [alleged] unprofessional error, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. That counsel simply could have done more is not a sufficient basis for finding a particular performance constitutionally inadequate. *Id.* at 697, 104 S.Ct. at 2069 ("The object of an ineffectiveness claim is not to grade counsel's performance."). *See also United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1014 (7th Cir.1987) ("[The reviewing court must] eliminate the distorting effects [of hindsight] ... and evaluate the conduct from counsel's perspective at the time.").

■ In his brief and at oral argument, Resnover names other persons, in addition to his father, that he claims should have testified during the penalty phase of the trial. For most of the people mentioned—for instance, a lawyer who represented an individual executed in 1981 and an executioner—we envision their testimony as only tangentially relevant to the instant case. Without even attempting to determine whether such testimony would have been admitted into evidence, we find that the failure to present these potential witnesses does not constitute a violation of the Sixth Amendment. We reiterate that *Strickland* requires us to focus, not upon whether counsel could have done a better job, but upon whether counsel provided the assistance necessary to ensure the fundamental fairness of the proceeding whose result is being challenged. *Strickland*, 466 U.S. at 696, 104 S.Ct. at 2069. As the district court properly concluded, Resnover's counsel was not incompetent or ineffective under the law. "[A]s difficult and as complex as this case is, and has become, defense

counsel met the standards of the Sixth Amendment in representing Gregory Resnover." *Resnover*, 754 F.Supp. at 1384.

We reach the same conclusion with Resnover's two other challenges to the effectiveness of his counsel's representation. Resnover argues that his trial counsel failed to implement his professed strategy of distancing Resnover from a co-defendant during the guilt/innocence phase of the trial. Specifically, Resnover claims that trial counsel failed to obtain the testimony of one Samara Palmer and file necessary pre-trial motions. These failures, Resnover asserts, amount to ineffective representation in violation of the Sixth Amendment.

Resnover also contends that he was denied effective representation on appeal. Apparently, Resnover's appellate counsel chose not to file a reply brief in response to Indiana's brief to the state supreme court. Resnover claims that due to the failure to file a reply brief, a misstatement of fact by the State of Indiana went unchallenged. Resnover points out that the Indiana Supreme Court repeated the misstatement of fact in its opinion affirming Resnover's death sentence. Yet, despite Resnover's arguments, neither of these two additional challenges can satisfy the two requirements of *Strickland:* that counsel's performance was in fact deficient, and that the deficiency prejudiced the defense.

■ As to trial counsel's performance, Resnover fails to establish that his representation was deficient. He can demonstrate no specific failures of his counsel; he even characterizes his counsel's legitimate efforts as less-than-effective assistance. For instance, before the trial began, Resnover's counsel sought assistance from Professor Kenneth Stroud of the Indiana University School of Law in preparing a motion to dismiss the death penalty count. Resnover suggests that this assistance from the professor demonstrates his counsel's failure. "Even this motion was not his work product," Resnover argues, "but rather it was the product of a law professor." Resnover's Brief at 52.

■ Arguments like this merely demonstrate Resnover's failure to satisfy *Strick-*

*land.* The fact that Resnover's trial counsel sought expert assistance from a law professor reflects positively on his performance. Similarly, Samara Palmer, the witness Resnover claims should have testified, refused to give any information to the Indiana court during the post-conviction hearing. Palmer, who apparently was present during the shoot-out that resulted in Sergeant Ohrberg's murder, asserted her Fifth Amendment privilege to remain silent. Therefore, we cannot say that the absence of her testimony from Resnover's trial amounted to ineffective assistance. On the contrary, it seems that her testimony, whatever it would have contributed, may have been unavailable.

■ Nonetheless, Resnover claims that the State impermissibly intimidated Palmer into not testifying on his behalf. *See* Appellant's Brief at 56–57. Resnover argues that the State, by deliberately withholding use immunity for Palmer, "used its might, in the form of potential murder charges, to keep [her] from giving testimony." *Id.* at 57. These arguments are inconsistent with settled law. The state is under no obligation to grant immunity. *Bubb v. State*, 434 N.E.2d 120, 124 (Ind.App.1982) ("It is clearly no violation ... to refuse immunity to defense witnesses.... The [F]ourteenth [A]mendment does not require prosecutors to give an 'immunity bath' to defense witnesses."). *Accord. United States v. Hooks*, 848 F.2d 785, 799 (7th Cir.1988) ("The [use immunity] statute does not obligate the government to grant defense witness immunity.... The trial court lacks authority to provide immunity for a defense witness absent a request by the government."). Resnover's claim, then, that the government impermissibly withheld immunity from Palmer is misplaced.

■ Resnover also contends that the trial court failed to perform its responsibility "to inquire into the validity of [Palmer's Fifth Amendment] claim." *See* Appellant's Brief at 56. He argues that the court, not the witness, must determine whether a real danger of prosecution exists that would substantiate the witness's refusal to testi-

fy. Resnover misinterprets the case law. We cannot agree that a witness' constitutional privilege against self-incrimination depends upon a judge's prediction of the likelihood of prosecution. *In re Folding Carton Antitrust Litigation*, 609 F.2d 867, 871 (7th Cir.1979). As we made clear in *Folding Carton*, "[I]t is only when there is but a fanciful possibility of prosecution that a claim of Fifth Amendment privilege is not well taken." *Id.*

 In the instant case, there surely was more than a "fanciful possibility" of prosecution. Samara Palmer was inside the residence at the time Sergeant Ohrberg was murdered. The state originally charged Palmer with murder and conspiracy to commit murder. Both charges subsequently were dismissed. *See* Post–Conviction Trans. at 61–66. The trial court sustained Palmer's assertion of her Fifth Amendment privilege because "[testifying] would require [her] to give an answer that she was present [at the time of Ohrberg's murder] and was charged at that time with the homicide.... And while those [charges] were dismissed ... by the State of Indiana, this was not done [under] any formal grant of immunity." *Id.* at 69. The court, then, properly sustained Palmer's assertion of her Fifth Amendment privilege. *See Folding Carton*, 609 F.2d at 871 ("When a witness can demonstrate any possibility of prosecution that is more than fanciful he has demonstrated a reasonable fear of prosecution sufficient to meet constitutional muster.").

Moreover, there is clear evidence to establish that Resnover's trial counsel fully explored Palmer's potential as a witness for the defense. Resnover's counsel received from the State of Indiana two statements made by Palmer. He also attended Palmer's deposition. Given these efforts, in addition to the absence of any available statement by Palmer that would have been critical to the defense, Resnover can estab-

lish neither that his trial counsel's performance was deficient nor that any alleged deficiency prejudiced his defense. Again, we reiterate that merely claiming that counsel could have done more—without a specific showing of insufficient performance and prejudice—is not enough to satisfy *Strickland.*

Resnover's challenge to his appellate counsel is a bit more engaging. Resnover argues that his appellate counsel failed him by neglecting to file a reply that could have challenged the inaccurate statements of fact contained in the State's brief to the Supreme Court of Indiana. Apparently, the Indiana Court relied on the misinformation contained in the State's brief. Resnover argues that that misinformation was critical: it mistakenly stated that Resnover may have been the individual who stepped out onto the porch and fired additional, point-blank shots into Sergeant Ohrberg's fallen body.[4]

 The state of Indiana responds that the appellate counsel's failure to file a reply brief to correct the misinformation did not prejudice the rights of Resnover. We agree. Appellate counsel already had cited the page in the record at which one of the other police officers testified that it was not Resnover who stepped onto the porch. Thus, it was *no prejudice to the defense* that a reply brief was not filed. *See Resnover*, 754 F.Supp. at 1379. Yet, because Resnover places such emphasis on his appellate counsel's failure to file a reply brief, Resnover in essence contends that he is entitled to a writ of habeas corpus because one of the findings of the Indiana Supreme Court was not based on the record. *See* Appellant's Brief at 63–64.

 The district court properly rejected this argument. *See Resnover*, 754 F.Supp. at 1379. In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court declared:

---

**4.** There is no dispute that the Indiana Court's statement that "[t]he person who stepped outside and shot Ohrberg two additional times as he lay on the porch fit [Resnover's] description" is false. *See Resnover*, 460 N.E.2d at 931. The evidence in the record clearly demonstrates

that, while Gregory Resnover shot at officers, including Ohrberg, as they attempted to enter the residence, he was not the individual who fired those additional shots on the porch. *See* Trial Trans. at 1425.

[I]n a challenge to a conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof beyond a reasonable doubt.

*Id.* at 324, 99 S.Ct. at 2791–92. *See also Resnover*, 754 F.Supp. at 1379 (collecting cases). A review of the record in the light most favorable to the prosecution convinces us—as it convinced the district court—that a rational trier of fact readily could have found the petitioner guilty of murder beyond a reasonable doubt.

We see no need to recite the extensive evidence supporting Resnover's conviction. That recitation can be found in the district court's decision. *See Resnover*, 754 F.Supp. at 1377–79. Suffice it to say that the testimony of the police officers at the scene of the murder, the physical evidence, namely a veritable arsenal of firearms, and the forensic evidence obtained from the autopsy of the victim, created a trial record that is replete with evidence supporting the jury's verdict. We hold that a rational jury indeed could have found Resnover guilty.

Resnover's remaining three arguments challenge both the trial court's instructions to the jury and the prosecutor's closing argument at the end of the guilt/innocence phase of the trial. Specifically, Resnover argues that the trial court's instruction failed to charge the jurors that they must make a separate and individualized determination concerning Resnover's guilt, and that the petitioner's rights under the Eighth and Fourteenth Amendments were violated as a result of the court's instructions. Moreover, he contends that various statements contained in the government's final argument amounted to prosecutorial misconduct in violation of the Fifth and Eighth Amendments. The record, however, does not support Resnover's assertions of error. On the contrary, we find no error in either the court's instructions or the government's closing remarks.

When reviewing a challenge to a jury instruction, we must view the instructions as a whole and consider the challenged instruction both in the context of the other instructions given and in light of the allegations of the complaint, the opening and closing arguments, and the evidence of the record. *Lynch v. Belden and Co., Inc.*, 882 F.2d 262, 267 (7th Cir.1989) (quotations omitted), *cert. denied*, 493 U.S. 1080, 110 S.Ct. 1134, 107 L.Ed.2d 1040 (1990). We must construe the instructions in a "common-sense manner, avoiding fastidiousness, inquiring whether the correct message was conveyed to the jury reasonably well." *Id.* (quoting *General Leaseways, Inc. v. National Truck Leasing Assn.*, 830 F.2d 716, 725 (7th Cir.1987). Given these directions, it is clear that, in the instant case, the trial court properly instructed the jury. The court told the jury that the law presumes both defendants to be innocent of the commission of any crime. *See* Instruction Number 39, Appellant's Appendix at 104. Moreover, the court used separate verdict forms for each defendant, Gregory Resnover and Tommie Smith. *See* Trial Trans. at 275–76, 283. Finally, if we view the instructions as a whole and in context of the arguments and evidence offered during the trial, then it is clear that Gregory Resnover received individual attention. Each defendant had his own attorney who argued separately. Indeed, both counsel and court made painstaking efforts to distinguish the participation, and resultant culpability, of each defendant in the tragic shooting on December 11, 1980. *See, e.g.*, Trial Trans. at 1911–19 (atomic absorption tests separately performed and evaluated on the hands of both defendants). There is no merit in the claim that the trial court failed to instruct the jury to give Resnover individualized attention.

We reach a similar result with Resnover's challenge to the court's instructions for the penalty phase of the trial. Resnover argues that the trial court failed to instruct the jury to give individualized consideration to the penalties each defendant should suffer. Specifically, Resnover contends that the court's accessory liability

instruction could have been understood by the jury as creating a presumption that Resnover should receive the same punishment as Tommie Smith.

 We disagree. Resnover received the individualized consideration at the penalty phase of the trial to which he was entitled. The facts of this case demonstrate that the trial court properly instructed the jury on accessory liability and the death penalty. The cases upon which Resnover relies for support are inapposite. In *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), for instance, the Supreme Court considered whether death is a valid penalty under the Eighth and Fourteenth Amendments for "one who neither took life, attempted to take life, nor intended to take life." *Id.* at 787, 102 S.Ct. at 3371. The Court concluded that the driver of the getaway car could not be given the death penalty because none of these individual factors was proven in the record.

In *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), however, the Supreme Court reconsidered the appropriate penalty for the non-triggerman. The Court held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Id.* at 158, 107 S.Ct. at 1688. The rule of *Tison* essentially captures the facts of the instant case. As we have discussed, the facts demonstrate Resnover's full participation in Sergeant Ohrberg's murder. Though we may not know for sure which defendant, Resnover or Smith, fired the fatal shot that killed Ohrberg, we are sure that Resnover shot at Ohrberg as he entered the house and fired at other police officers, several of whom were in uniform, as they moved away from the house for cover.

Resnover was not a minor participant, nor was he under the substantial domination of another. Indiana Code 35–50–2–9, which sets forth the death penalty and those to whom it may apply, makes allowance for these situations. In Instruction Number 25, the trial court informed the jury of this possible interpretation of events, which, by their verdict, they rejected. Moreover, when passing sentence on Resnover, the trial court specifically considered Resnover's participation in the crimes and the possibility of domination by Smith. *See* Trial Trans. at 2563–64. Like the jury, the court rejected those possibilities. *Id.* Thus, we have no doubt that Resnover was afforded individualized consideration during both the guilt/innocence and the penalty phases of the trial.

Finally, we find no constitutional error in the state's closing argument to the jury. Resnover claims that several of the prosecutor's comments unfairly called attention to a personal friendship between the prosecutor and Sergeant Ohrberg. Other remarks, Resnover contends, further violated constitutional guarantees by commenting on his refusal to testify. Resnover challenges the following comments of the prosecutor:

It's been a long time since these guys killed my detective.

This gun, in his hands took my detective's life.

There's another rule that says we [lawyers] can't testify, we can't give facts. Well, I was Jack Ohrberg's associate in law enforcement for a long time. And as he was Homicide Supervisor and, I was his lawyer, the same as I'm Bob Hoke's lawyer, and Lt. Strode's lawyer, and Frank Wilson's and Louis Christs's (sic). So that would be easy to do so, but I'm not gonna do it....

Now I don't want these guys convicted of anything because my friend died. I want them convicted because they did it.

This is a very serious part of this trial, regardless of whether the defendants chose to be here or not.

We have before you today figuratively if not actually two defendants who are guilty of murder and conspiracy to commit murder.

Let's set the stage just a little bit. Here's the death penalty. It's these right here. I won't put out all one hundred bullets. We'll take the bullet-proof vest, and put in back here. This is Jack

Ohrberg, and that is Jack Ohrberg. Now we've got the stage, right? Wait, we're missing one thing. De-sanitize it. Let's put the defendants back in the courtroom, don't punish them for their actions, but don't reward them for turning their backs on justice. Let's de-sanitize them.

Let's put Greg Resnover and Tommie Smith back in the courtroom. Just so we don't forget who they are.

Trial Trans. at 2248, 2254, 2259, 2265, 2441, 2442, 2480–81, 2484.

 The comments about a relationship between Ohrberg and the prosecutor did not deprive Resnover of any right. While we might agree that these statements, as the district court remarked, would have been better left unsaid, we nonetheless find no constitutional error. *See Resnover*, 754 F.Supp. at 1389 (citing *United States v. Dominguez*, 835 F.2d 694 (7th Cir.1987)). The prosecutor conveyed no substantive, personal information to the jury through these comments. Indeed, looking at the prosecutor's presentation as whole, it is clear that the prosecutor focused the jury's attention on the admitted evidence. There was no reversible error.

Similarly, the prosecutor's comments regarding Resnover's refusal to be present in the courtroom during the penalty phase of the trial do not amount to error. Indeed, the excerpts are not comments on Resnover's refusal to testify. Instead, they refer to the fact that Resnover and Smith boycotted the penalty phase of the trial. There was no constitutional violation. The prosecutor's statements merely pointed out that the defendants were absent from the courtroom; they did not comment on either defendant's exercise of his privilege against self-incrimination. *See Cunningham v. Perini*, 655 F.2d 98 (6th Cir.1981) (holding that prosecutor's statements which referred to defendant's demeanor at the counsel table did not amount to a comment on failure of the defendant to testify), *cert. denied*, 455 U.S. 924, 102 S.Ct. 1286, 71 L.Ed.2d 467 (1982). Thus, while the Indiana prosecutor struck "hard blows" at Resnover, we do not find that he struck "foul blows." *See Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). The prosecutor's comments do not amount to reversible error. Resnover's remaining arguments are without merit.

### III.

For the foregoing reasons, we AFFIRM the district court's denial of Gregory Resnover's petition for habeas corpus.