Filed 11/2/23  P. v. Moreno CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BRENDA MORENO,<br><br>    Defendant and Appellant. | B319890<br><br>(Los Angeles County<br>Super. Ct. No. KA042134) |

APPEAL from an order of the Superior Court of Los Angeles County, Rob B. Villeza, Judge.  Affirmed.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior

Assistant Attorney General, Seth McCutcheon and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Brenda Moreno (defendant) appeals the trial court's order denying her petition for resentencing filed pursuant to Penal Code section 1172.6.[1]  Concluding there was no error, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.    Facts

#### A.    *The underlying crimes*

On a Tuesday night in late September 1998, defendant and four others—her roommate, her roommate's boyfriend (the boyfriend), and two of his friends (Dennis Barroso and Brian Scott)—drove around the San Gabriel Valley committing a rash of violent crimes.  Defendant joined in because she "wanted to get the money" from the robberies they planned to commit "to buy drugs and to pay [her] rent."

With the roommate driving an SUV, the group prepared for the spree by making three stops—two separate stops to pick up a total of four shotguns and four handguns, and one stop to pick up black knitted gloves.

After the boyfriend suggested driving to Diamond Bar to find their first victim, defendant willingly gave the roommate driving directions.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in text.  (Stats. 2022, ch. 58, § 10.)  For the sake of simplicity, we refer to the section by its new numbering only.

For their first crime of the evening, the group followed a woman driving an Infiniti. When the woman pulled over across the street from her house, the boyfriend and his two friends got out of their SUV, with shotguns and handguns on display. They demanded the woman's purse, her watch and her necklace. The boyfriend drove off in the Infiniti. One of the boyfriend's friends expressed his intention to "shoot her," and the others had to talk him out of it. Afterwards, the group rendezvoused at the boyfriend's apartment to split up the proceeds of the carjacking. Defendant "wanted to go and do it again" because it "seemed like fun" and "was so easy." One of the boyfriend's friends declined to continue.

The group then tried to commit a second carjacking in Rosemead, but ultimately failed. As before, the roommate followed the intended victim into his driveway, and the boyfriend and his remaining friend jumped out of the SUV to point shotguns at the driver. But the driver honked his horn, put his car in reverse, and drove away—but not before the remaining friend shot at the car.

After that failure, the roommate drove up alongside a group of four pedestrians—a man named Gilbert Rivas (Rivas), his fiancée, his fiancée's teenage son and Rivas's teenage brother. The boyfriend and his friend leaned out of the SUV's windows and demanded to know Rivas's gang affiliation; when Rivas replied that he did not "bang," the two men in the SUV proclaimed their affiliation with the "Valinda Flats" gang. They then jumped out of the car—with the two men again wielding shotguns. Rivas's teenage brother handed over cash, some cigarettes and his new black Nikes. Defendant then demanded that Rivas's fiancée hand over her rings. When she hesitated and

explained that her rings had little monetary value but great sentimental value, defendant yelled, "Take off your rings, bitch!" and punched her in the face. When Rivas told defendant that she did not need to hurt his fiancée or disrespect them, the boyfriend's friend shot Rivas in the stomach and the boyfriend shot Rivas twice more—once in the back and once in the head. They all got back into the roommate's car, leaving Rivas to die from his wounds.

The next day, defendant dropped off the stolen Infiniti at a body shop; shredded some documents from the Diamond Bar robbery; changed her appearance by cutting and dyeing her hair; and spent the rest of the day "g[etting] high" and watching movies.

### B. *Plea, conviction, and sentencing*

On June 1, 1999, defendant entered a plea agreement in which she pleaded guilty to second degree murder (§ 187, subd. (a)) and one count of robbery (§ 211) in exchange for the dismissal of the remaining charges and a sentence of 15 years to life in prison. As part of the plea agreement, defendant agreed to testify fully and truthfully at all stages of the trial of her codefendants—the roommate, the boyfriend, and the boyfriend's friend. The trial court sentenced defendant to the agreed-upon term of 15 years to life. Defendant did not appeal her conviction.

## II. Procedural Background

On November 30, 2020, defendant filed a petition for resentencing under section 1172.6. After appointing counsel for defendant and entertaining briefing, the trial court in October 2021 issued an order to show cause and set the matter for an evidentiary hearing.

4

On April 20, 2022, the trial court held an evidentiary hearing. At the beginning of the hearing, the court recited the list of documents that it had reviewed and considered for the purposes of the hearing. Among other things, that list included (1) the pleadings and attached exhibits; (2) the record of conviction, which included "the preliminary hearing transcript" and "portions of the trial transcript, including the testimony of [defendant] as a witness for the People against the remaining defendants"; (3) the plea agreement; and (4) the Court of Appeal decision issued in the boyfriend's friend's appeal on April 24, 2001.[2] Defendant had no objection to the admission of any of the listed items. Defendant introduced no new evidence and did not testify.

The trial court denied defendant's petition after finding, beyond a reasonable doubt, that she was a major participant in the underlying robbery and had acted with reckless disregard for human life. Specifically, the court found defendant (1) played a major role in planning the robberies and "provided directions to the targeted areas where the incidents occurred"; (2) knew guns would be used to commit the robberies because she was inside the car when they were retrieved and used in the earlier incidents; (3) was aware of the danger posed by the crime because the boyfriend's friend had previously fired his weapon during the failed carjacking; (4) did nothing to minimize the risk of violence but instead escalated the Rivas robbery by punching Rivas's fiancée in the face when she refused to hand over her rings, causing Rivas to intervene, leading to his death; and (5) did not render any aid to Rivas but fled with the others.

---

2    (*People v. Barroso et al.* (Apr. 24, 2001, B135322) [nonpub. opn.].)

5

### III.  Appeal

Defendant filed this timely appeal.

### DISCUSSION

Defendant argues that the trial court erred in denying her petition because (1) the court impermissibly relied on the facts set forth in the appellate opinion involving the boyfriend's friend, in violation of section 1172.6, subdivision (d)(3); and (2) the court misconstrued one snippet of her testimony at the boyfriend's friend's trial.[3]

### I.  Pertinent Law

In 2018, our Legislature amended the definition of "murder" in our state to preclude a jury from "imput[ing]" the "malice" element of that crime "based solely on [a defendant's] participation in a crime."  (§ 188, subd. (a)(3).)  Our Legislature's purpose was to ensure that "[a] person's culpability for murder [is] premised upon that person's own actions and subjective mens rea."  (Stats. 2018, ch. 1015, § 1(g).)  As amended, liability for murder is limited to persons (1) who are the actual killer; (2) who aided and abetted the actual killer in the murder (that is, who acted with the intent to kill); or (3) who were a major participant in the underlying felony that resulted in the killing, but only if

---

[3]    In her opening brief, defendant argued that the record did not support five specific factual findings made by the trial court. This argument was premised on the trial court's incorrect reference to only one of three volumes of transcripts from the boyfriend's friend's trial.  When the People pointed out the trial court's error and explained how the other two volumes of transcripts set forth the evidence that supported the factual findings defendant attacked, defendant in her reply appropriately withdrew that argument.  Thus, we have no occasion to address it.

they also acted with reckless indifference to human life. (§§ 188, subd. (a)(3), 189, subd. (e); e.g., *People v. Johns* (2020) 50 Cal.App.5th 46, 58-59.)

Section 1172.6 is the procedural vehicle by which persons convicted in now-final judgments can seek to vacate convictions that do not satisfy the now-current definition of "murder." Where, as here, a defendant files a facially sufficient petition and the record does not otherwise foreclose relief as a matter of law, the trial court must issue an order to show cause and convene an evidentiary hearing. (§ 1172.6, subd. (c).) At the hearing, the People have the burden of proving to the trial court, as an independent factfinder, that a defendant is guilty of murder on a still-valid theory. (§ 1172.6, subd. (d)(3).) At that hearing, the Evidence Code "govern[s]," "except that the court may [also] consider" (1) "evidence previously admitted at any prior hearing or trial that is admissible under current law," (2) "stipulated evidence," (3) "matters judicially noticed," and (4) "the procedural history of the case recited in any prior appellate opinion." (*Ibid.*)

## II.    Analysis

Neither of defendant's arguments has merit.

The trial court did not err by impermissibly considering the *facts* from the appellate opinion in the boyfriend's friend's case. To begin, the trial court did *not* rely on the facts from that opinion. Defendant asserts that the court cited the opinion for the proposition that defendant jumped out of the car to confront Rivas and the others *while armed*, but the trial court cited the preliminary hearing transcript—not the appellate opinion. Further, whether defendant was *armed* at that time was not a critical factor in the trial court's analysis of whether she acted with reckless indifference to the value of human life; indeed, the

7

court remarked that "defendant didn't supply *or use guns* during the crime spree." (Italics added.) Lastly, even if the trial court *had* relied on the passage from the appellate opinion indicating that all three people who jumped out of the SUV were armed, this error is not cognizable because defendant forfeited the error by saying she did not "object" to the trial court's unrestricted reliance on that opinion. Defendant's argument that section 1172.6, subdivision (d)(3), precludes a forfeiture or waiver was rejected in *People v. Vance* (2023) 94 Cal.App.5th 706, 713-714. We see no basis to disagree with *Vance*.

The trial court also did not misconstrue a snippet of her testimony from the boyfriend's friend's trial. At that trial, she testified, ". . . I chose to get off and sock this lady, and maybe that did trigger off the shooting . . . maybe I was the person that triggered off the shooting, you know, and *I feel good*." (Italics added.) She further explained, "Even though I'm crying, *I feel good* that I came out and I said the truth because this guy's life was taken away." (Italics added.) Defendant complains that the trial court read the first snippet of her testimony as indicating that she "fe[lt] good" about triggering the shooting. We agree that the full context of her testimony would not support this reading, but the trial court did not construe her testimony in this way. To the contrary, when assessing whether defendant acted with reckless indifference to human life, the court repeated defendant's statement verbatim on two occasions but on neither occasion commented on defendant's use of the word "good." We decline to invalidate the court's ruling on the basis of a misconstruction of the court's reasoning.

And even if we assume that the trial court somehow committed either error, those errors were harmless because

substantial evidence supports the trial court's finding beyond a reasonable doubt that defendant acted with reckless indifference to human life—even if we ignore the contents of the appellate opinion and construe the "feel good" comment in the manner defendant suggests.[4]  (*People v. Nieber* (2022) 82 Cal.App.5th 458, 476 [applying substantial evidence review].)

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), our Supreme Court spelled out that a defendant acts with reckless indifference to human life when she "'"knowingly engag[es] in criminal activities known to carry a grave risk of death."'" (*Banks*, at p. 801, quoting *People v. Estrada* (1995) 11 Cal.4th 568, 577, quoting *Tison v. Arizona* (1987) 481 U.S. 137, 157.)  Our Supreme Court has identified a number of considerations bearing on whether a defendant has acted with reckless indifference to human life.  "No one of these considerations is necessary, nor is any one of them necessarily sufficient" (*Banks*, at p. 803); what matters is the totality of the considerations (*In re Scoggins* (2020) 9 Cal.5th 667, 677).  The considerations are: (1) "Did the defendant use or know that a gun would be used during the [underlying] felony," and, relatedly, "[h]ow many weapons were ultimately used?"; (2) "Was the defendant physically present at the crime," such that she had "the opportunity to restrain the crime or aid the victim?"; (3) "What was the duration of the interaction between the perpetrators of the [underlying] felony and the victims?"; (4) "What was the defendant's knowledge of . . . her confederate's propensity for violence or likelihood of using

---

4      We need not examine the major participant element because defendant concedes this element.  (*People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1084, 1087.)

lethal force?"; and (5) "What efforts did the defendant make to minimize the risks of violence during the felony?" (*Ibid.*, citing *Clark*, *supra*, 63 Cal.4th at pp. 618-623.)

The *Banks* factors support the trial court's finding that defendant acted with reckless indifference to human life.

First, defendant knew that guns would be used in the confrontation with Rivas and his family. She was present when the group retrieved the cache of guns; she was present when the boyfriend and his friends displayed the guns during the first carjacking and second failed carjacking; and she was present when the boyfriend's friend shot at the fleeing victim of the second carjacking. Whether defendant *herself* used a gun does not diminish her awareness that her compatriots were "locked and loaded."

Second, defendant knew of the propensity for violence of her cohorts because of what happened in the two carjackings earlier in the evening.

Third, defendant was present at the crime scene and played an integral part in the robbery. When defendant believed Rivas's fiancée was not complying quickly enough with the group's demands, she stepped forward and punched the fiancée in the face and demanded her rings. It was *that* conduct that immediately escalated the confrontation, as defendant herself acknowledged when testifying.

Fourth, defendant did nothing to minimize the risk of violence. To the contrary, defendant *knew* the boyfriend's friend was trigger happy and she nevertheless escalated the situation by punching Rivas's fiancée.

Finally, defendant did nothing to aid Rivas when he was shot. She fled with the others, and later disguised her looks to

10

evade arrest.

## DISPOSITION

The order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

HOFFSTADT


We concur:


_____, Acting P. J.

ASHMANN-GERST


_____, J.

CHAVEZ